UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NASTASI & ASSOCIATES, INC.,

Plaintiff,

v.

BLOOMBERG, L.P., TURNER
CONSTRUCTION CORP., EUROTECH
CONSTRUCTION CORP., DONALDSON
ACOUSTICS, CO. INC., JAVIER PAULINO,
MARILYN FRANCISCO, ANTHONY
GUZZONE, WILLIAM DALE
SUMMERVILLE, LAUREN ECKHART
SMITH, MICHAEL CAMPANA, RONALD
OLSON, VITO NIGRO, FAY DEVLIN,
DUANE ROBERT DONALDSON,
DOUGLAS DONALDSON, and Does 1-25,

Defendants.

CIVIL ACTION NO.:

COMPLAINT AND JURY DEMAND

## COMPLAINT

Plaintiff Nastasi & Associates, Inc. ("Nastasi & Associates" or the "Company"), by and

through its undersigned attorneys, makes the following factual allegations applicable to each cause

of action pled herein against Defendants Bloomberg, L.P. ("Bloomberg"), Javier Paulino, Marilyn

Francisco, Anthony Guzzone, William Dale Summerville ("Dale Summerville"), Lauren Eckhart

Smith, Michael Campana (referred to herein individually or collectively as the "Bloomberg

Defendants"), Turner Construction Corp. ("Turner"), Ronald Olson, Vito Nigro (each referred

herein individually or collectively, along with Turner, as the "Turner Defendants"), Eurotech

Construction Corp. ("Eurotech"), Fay Devlin,   Donaldson Acoustics, Inc. ("Donaldson

Acoustics"), Duane Robert Donaldson ("Robert Donaldson"), Douglas Donaldson, (each referred herein individually or collectively as the "Subcontractor Defendants") and Does 1-25.

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action to recover hundreds of millions of dollars in damages sustained as a result of a massive, multi-million dollar bid rigging scheme designed to manipulate the market for interior construction.  Defendants Bloomberg and Turner conspired, through high level executives at both companies, including Bloomberg's Head of Global Construction, Anthony Guzzone, and Construction Managers Michael Campana and Javier Paulino, and Turner's Vice President and Account Executive, Ronald Olson, Project Superintendent Vito Nigro, and various executives in charge of Turner's Estimating and Purchasing Departments, to steer construction jobs at Bloomberg properties to hand-picked subcontractors, including EuroTech and Donaldson Acoustics.  Due to this brazen market manipulation, subcontractors who were not part of the conspiracy to rig the bids, such as Nastasi & Associates, were improperly denied jobs through the competitive bidding process even when they submitted the most competitive bids.

2.      The interior construction market in New York is a highly profitable market.  Every year, corporations like Bloomberg pay millions of dollars to design, build and maintain office space, including through drywall, carpeting, plumbing, millwork, and electrical system work.  Interior construction is an estimated $9.4 billion-a-year industry in New York.

3.      From about 2010 through 2018, Defendants worked together to create and promote the perception of a competitive market for interior construction projects at Bloomberg properties.  Bloomberg, through Turner, requested bids from subcontractors and Turner managed the bidding process.

4.      In reality, however, Defendants conspired to pre-select the winning bids based on a bid rigging agreement between them.  Bloomberg's Head of Construction, Anthony Guzzone, and other high-level Bloomberg executives, approved the winning bids from subcontractors who participated in their bid rigging scheme, and Turner modified and falsified the bids from subcontractors not involved in the scheme, such as Nastasi & Associates, in order to further the scheme and manufacture the perception of a competitive bidding process. During the scheme, Anthony Nastasi ("Nastasi"), Principal of Nastasi & Associates, discovered issues with the bidding process and sought to raise those concerns to both Bloomberg executives, including Anthony Guzzone and Lauren Eckhart Smith, Global Head of Facilities and Real Estate, and Turner executives and its legal and compliance counsel.  Bloomberg ignored Nastasi's concerns, and Turner either ignored them or retaliated against Nastasi & Associates.

5.      As a result of the conspirators' market manipulation scheme and other deceptive misconduct, Nastasi & Associates, a long-standing, growing and profitable subcontractor that generated yearly over a hundred million dollars of revenue at its peak, lost its business and employees, causing the Company to swiftly collapse.

6.      Nastasi's concerns only grew in 2018 with reports of a criminal investigation by the Manhattan District Attorney's Office into interior construction work performed for Bloomberg and Turner.

7.      Then, on December 11, 2018, Manhattan District Attorney Cy Vance confirmed Nastasi's concerns, announcing the criminal indictments of numerous Bloomberg and Turner executives who were deeply involved in corruptly steering work for Bloomberg projects in which Nastasi & Associates bid, believing itself to be a competitive bidder with a fair opportunity to win. The criminal indictments reveal the rampant payment of bribes and unfettered, reckless control

accorded to senior executives at Bloomberg and Turner who took advantage of the lack of oversight to orchestrate a massive bid rigging scheme that destroyed honest Bloomberg subcontractors and the marketplace for competitive bidding for interior construction projects.

8.       The breadth of the corruption and this specific scheme is laid out by the Manhattan District Attorney's Office in their press release:

> New York's sky-high construction costs are driven not only by market demand, but by pay-to-play industry corruption that makes it impossible for honest companies to compete. Thanks to the unique expertise of prosecutors in my Office's Rackets Bureau, as well as our partners in the New York State Police, this massive, years-long kickback scheme has come to an end. Today's indictments and guilty pleas demonstrate that if you are engaging in organized crime that blocks fair competition in Manhattan, our prosecutors will find you, turn over every stone, and shut you down. This is exactly the type of case that our Rackets Bureau was created a hundred years ago to bring."

9.       While bribes and illicit payments are not new to the construction industry, this scheme to manipulate the market for bidding at Bloomberg is unique and particularly brazen in that it involved Bloomberg's Global Head of Construction and other high level construction executives (essentially the top management in Bloomberg's global real estate group), and the top Turner leadership, as well as every key department at Turner, one of the largest general contractors in New York.

10.       Indeed, Turner was hired by Bloomberg ostensibly to correct issues with bid inflation and kickbacks involving Bloomberg's predecessor contractor, but, instead, conspired with high ranking Bloomberg executives to develop a bid rigging scheme that cost subcontractors their businesses and caused hundreds of millions of dollars in damages.

11.       The criminal investigation thus far has revealed a web of agreements between these high-level executives of Bloomberg, Turner, and the Subcontractor Defendants, including payments disguised in correspondence by the perpetrators as "sandwiches," resulting in millions

of dollars of bid inflation to Bloomberg.  Notably, though, the scheme caused much more meaningful harm to the honest subcontractors, who were improperly denied rigged bids to Bloomberg's chosen subcontractors for dry wall, carpeting, plumbing, millwork, and electrical systems work.  These sub-contractors lost tens of millions of dollars in work they would have obtained had it not been for the bribes.

12.     Moreover, Bloomberg and Turner are such a large part of the interior construction business that this bid rigging scheme also caused the destruction of entire subcontractor businesses who relied on work from Bloomberg and/or Turner and who lost even more work due to retaliation from the conspirators.  As Turner itself has advised large groups of subcontractors, it had the power to cause such destruction, and in this case, it carried out that threat.

13.     Plaintiff Nastasi & Associates is a contracting company that specialized in carpentry work that included the installation and maintenance of interior walls, ceilings, architectural woodwork, and plexiglass on large commercial projects around the world, but most prominently in New York City.

14.     For years, starting in 1995, Nastasi & Associates performed extensive work on many Bloomberg buildings throughout New York City, including regular maintenance work that required 24-hour availability year-round for repairs on four Bloomberg properties, 731 Lexington Avenue, 340 West Street, 499 Park Avenue, and 110 East 59th Street.  By all accounts, the work was exemplary, and Nastasi & Associates was a trusted and valued contractor on the Bloomberg properties, one of the largest property lessors in New York City.

15.     Nastasi & Associates also worked closely with Turner on hundreds of jobs, including work on Bloomberg properties for which Turner was the general contractor or a consultant.  When Bloomberg decided to build out a new headquarters at 120 Park Avenue (herein

"the 120 Park Project"), Nastasi & Associates was well positioned to compete for bids on all sections of the 120 Park Project.

16.     Beginning in or about 2011, and continuing throughout all relevant time periods described herein, Defendants conspired to rig bids for construction at the 120 Park Project and other Bloomberg construction jobs.

17.     This association-in-fact criminal enterprise (the "Enterprise") consisting of Turner, the named Turner and Bloomberg executives, and the Subcontractor Defendants, sought valid bids for the 120 Park Project, and other Bloomberg construction jobs, as a pretextual cover for its conspiracy.   Nastasi & Associates submitted bids for work at the 120 Park Project, and other honest subcontractors submitted bids for work at both the 120 Park Project and other Bloomberg jobs, which they believed they had a valid chance to win, but, in reality, never had any chance of being awarded.  Despite being the most experienced contractor for the work, and in many cases, the lowest bidder, Nastasi & Associates repeatedly lost the jobs to the Subcontractor Defendants, as well as other subcontractors, who were the rigged winners of a bidding scheme perpetrated by the Bloomberg Defendants, the Turner Defendants, and the Subcontractor Defendants.

18.     The Enterprise conspired to cause Nastasi & Associates to lose validly bid projects, including the ones at the 120 Park Project, by falsely inflating Nastasi & Associates' bids to give the appearance that they were inferior, and, on information and belief, predetermined the winning bidders based on illicit payments or bribes.

19.     After Nastasi & Associates repeatedly complained about this rigged system to Bloomberg and Turner, the Enterprise intentionally destroyed the Company's business by: a) fabricating a union Stop Work Order from the New York City District Council of Carpenters; b) inserting a hand-picked replacement, Eurotech, into Bloomberg's regular maintenance work; c)

intentionally utilizing a clause from a defunct agreement as a pretext for Bloomberg to terminate Nastasi & Associates; and d) refusing to pay Nastasi & Associates millions of dollars in approved change order work to purposely cut off its cash flow and destroy its business.

20.     Upon the District Attorney's announcement of indictments against high-level Bloomberg and Turner executives, Bloomberg and Turner quickly and conspicuously announced that the massive scheme went undetected, despite their self-proclaimed highly competent and diligent compliance programs, which were anything but competent.  The schemes perpetrated by the Enterprise reached the highest levels of these companies, permeating through many departments and levels of employees in different areas of the construction business.  The red flags for Bloomberg and Turner were clear and frequent.

21.     Even worse, Nastasi & Associates reported the schemes directly to both Bloomberg and Turner, including the highest levels of seniority and in-house counsel, without any response whatsoever.  Indeed, as Plaintiff began speaking out more loudly, Defendants, in retaliation, began systematically destroying its business altogether.  And, throughout this time period, many of the individuals named in this lawsuit, some of whom have pled guilty or have been criminally indicted for various related offenses, were promoted through the ranks at Bloomberg and Turner.

22.     The bid rigging scheme directly harmed competition, in violation of both federal and state antitrust laws, causing significant damage to Plaintiff, not only in lost bids, but in future business, by employing mob-like tactics to force Nastasi & Associates out of the construction business altogether.  The Enterprise's schemes and manipulations ultimately succeeded.

23.     As a result of Defendants' anticompetitive, criminal bid rigging and fraudulent schemes, Plaintiff has suffered tens of millions of dollars in lost bids and the loss of its entire business worth hundreds of millions of dollars.

## PARTIES

24.     Plaintiff Nastasi & Associates, Inc. is a New York Corporation with its principal place of business in East Norwich, NY.

25.     Defendant Bloomberg L.P. is a New York limited partnership with its principal place of business in New York, NY.

26.     Defendant Turner Construction Corp. is a New York corporation with its principal place of business in New York, NY.

27.     Defendant Eurotech Construction Corp. is a New York corporation with its principal place of business in New York, NY.

28.     Defendant Donaldson Acoustics Co., Inc. is a New York corporation with its principal place of business in New York, NY.

29.     Defendant Javier Paulino is an individual residing in Nutley, NJ.

30.     Defendant Marilyn Francisco is an individual residing in Hillsdale, NJ.

31.     Upon information and belief, defendant Anthony Guzzone is an individual residing in Middletown, NJ.

32.     Upon information and belief, defendant William Dale Summerville is an individual residing in New York, NY.

33.     Defendant Lauren Eckhart Smith is an individual residing in New York, NY.

34.     Upon information and belief, defendant Michael Campana is an individual residing in Brooklyn, NY.

35.     Upon information and belief, defendant Ronald Olson is an individual residing in Massapequa, NY.

36.     Upon information and belief, defendant Vito Nigro is an individual residing in Middletown, NJ.

37.     Upon information and belief, defendant Fay Devlin is an individual residing in Irvington, NY.

38.     Upon information and belief, defendant Duane Robert Donaldson is an individual residing in Hauppauge, NY.

39.     Upon information and belief, defendant Douglas Donaldson is an individual residing in Syosset, NY.

40.     Defendant Does 1-25 are the parties whose true names and capacities are currently unknown.  On information and belief, Does 1-25 are in some manner responsible for the injuries sustained by Plaintiff and/or Defendants' predecessors-in-interest, successors-in-interest, partners, agents, principals, employers, parent corporations, subsidiary corporations, members, instrumentalities, alter egos, conduits, joint ventures, co-conspirators, aiders and abettors, or connected with, and/or legally responsible for the actions of Defendants.

## JURISDICTION AND VENUE

41.     This Court has original subject matter jurisdiction over this case because Plaintiff's Sherman Act claim arises under the laws of the United States.  15 U.S.C. § 1, et seq.  This Court also has original subject matter jurisdiction pursuant to its civil RICO claim. 18 U.S.C. § 1964(c).  This Court has pendent jurisdiction over all state law claims.

42.     The Court has personal jurisdiction over Defendants, who have at least minimum contacts with the State of New York.

43.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SPECIFIC FACTUAL ALLEGATIONS

A.       **Bloomberg and Corruption in the Construction Industry**

44.       Bloomberg has long been on notice of the rampant corruption in the interior construction industry.  In 2014, Bloomberg's former general contractor, Structure Tone, Inc. ("Structure Tone") pleaded guilty to corruption charges in connection with allegations that it was causing the inflation of construction costs for its clients, including Bloomberg.

45.       The guilty plea, which included a $55 million restitution payment, ended an investigation that lasted several years, and covered the time period of 2005-2009.

46.       Turner was a consultant on the Bloomberg project at 731 Lexington Avenue, the Structure Tone projects which were the subject of that investigation.

47.       In or around 2010, Bloomberg replaced Structure Tone with Turner as its general contractor for all of its major construction projects in New York City.

48.       Plaintiff is informed and believes that Bloomberg's construction group, led at the time by Anthony Guzzone, selected Turner, in part, for the purpose of projecting to others that Bloomberg was running an honest, competitive bidding process for its construction projects. Turner is one of the biggest names in the business.

49.       The truth was that Guzzone, in his role as Head of Global Construction, in concert with Ronald Olson and Vito Nigro of Turner installed Turner in order to pursue a bid rigging scheme of far greater consequence to Bloomberg's subcontractors than the Structure Tone issues.

50.       Turner became the general contractor on both the 120 Park Project and another project at 919 Third Avenue, among other Bloomberg projects, and wielded great power in that capacity.

51.     In its role as general contractor, Turner conspired with Bloomberg, through their executives, to employ a bid rigging scheme that required the agreement and involvement of these executives as well as all of the Turner business departments involved in managing the Bloomberg bidding process and several subcontractors.

52.     The conspiracy focused on construction work at certain Bloomberg locations – including the 120 Park Project and at 919 Third Avenue, among potentially others.  As part of the schemes, the Enterprise passed inside information on highly prized contracts to the Subcontractor Defendants, or falsified bid submissions, to help the predetermined subcontractors secure bids for lucrative interior construction jobs.  In other instances, the Enterprise recorded falsified documents and/or fabricated invoices and purchase orders to inflate budgets for the purpose of manipulating the bidding process.

53.     As reported extensively by the press following the December 2018 announcement of indictments in connection with the scheme, high-level executives from Bloomberg, Turner, Eurotech, and Donaldson engaged in an anticompetitive, criminal conspiracy that stifled competition by discarding subcontractors that they either did not have a financial interest in or who did not pay Bloomberg and Turner executives bribes.

54.     To secure contracts with the Bloomberg and Turner executives, "subcontractors provided the former Bloomberg and Turner executives with cash bribes and incentives including vacations and home renovations," as stated in the Manhattan District Attorney's Office December 11, 2018 press release.

55.     Further, the New York District Attorney stated that the indicted individuals, including Defendants Anthony Guzzone (Bloomberg), Michael Campana (Bloomberg), Ronald Olson (Turner), Vito Nigro (Turner), Donna Fleming (Litespeed Electric, Inc.), Robert Fleming

(Litespeed Electric, Inc.), Louis Squallante (Litespeed Electric, Inc.), Mehul Changhani (Litespeed Electric, Inc.), Thomas Conte (Litespeed), Michael Carrone (Cooling Guard Mechanical, Inc.), Hugh O'Kane (Hugh O'Kane Electric, Inc.), Rafael Betancourt (Turtle & Hughes, Inc.), and Angel Ocasio (Turtle & Hughes, Inc.), engaged in a criminal "conspiracy by paying commercial bribes, engaging in bid-rigging, falsifying business records, and laundering criminal proceeds of the schemes."

56.     The District Attorney's announcement labeled the scheme as a multi-million dollar "bid-rigging and commercial bribery conspiracy" levying charges against the 14 individuals that included Conspiracy in the Fourth Degree, Grand Larceny in the First and Second Degrees, Money Laundering in the First and Second Degrees, Commercial Bribery in the First Degree, as well as others.  As of December 11, 2018, the District Attorney had obtained over a dozen guilty pleas against individuals and corporations, and $5.5 million in restitution.

57.     These criminal complaints are only the tip of the bid rigging iceberg.  District Attorney Vance described how Defendants' scheme made it impossible for *honest companies* to compete in the marketplace for interior construction projects.

58.     Nastasi & Associates is one of those victims, and the anticompetitive, criminal conspiracy was the proximate cause of its loss of bids directly connected to the 120 Park Project, the loss of future work in connection with that and other projects, and the loss of its business entirely.

59.     Nastasi & Associates, at one time a $100 million per year business, has been destroyed, an intended direct and proximate result of the conspiracy employed by the Bloomberg Defendants, the Turner Defendants, and the Subcontractor Defendants.

60.     Notably, the indictments are consistent with Plaintiff's experience with the way Bloomberg awarded construction jobs, and how Turner controlled the New York City construction industry; however, the responsibility is shared by more than just the indicted individuals.  Given the Structure Tone history, Bloomberg and Turner were on notice of the significant potential for market manipulation schemes of the kind that played out for the last eight years, and their failure to establish controls at either company to detect the bid rigging that victimized Nastasi & Associates and others is nothing short of reckless, or worse, intentional.

61.     The inference of intentional or reckless misconduct, beyond merely the named high-level executive Defendants, is particularly strong here because Nastasi & Associates made efforts to raise competitive bidding issues to Bloomberg and Turner directly, at various times during the scheme, without any type of adequate or diligent response.

## B.  Nastasi & Associates, a Leader in the Interior Construction Industry, Begins Long, Successful Partnership with Bloomberg

62.     As described in a recent New York Times article, "[i]nterior construction is a little-known but highly profitable world in which corporations pay millions of dollars to design and build the guts – dry wall, carpeting, plumbing, millwork, electrical systems – of their offices."  It is a $9.4 billion industry in New York City.

63.     Nastasi & Associates has been in business for dozens of years, providing contracting services for interior construction projects on major developments around the world.

64.     At one time, Nastasi & Associates was one of the largest, if not the largest, union carpentry firms in the United States, consistently generating tens of millions of dollars per year on work it performed for various major contractors including Structure Tone, Turner, Bovis Lend Lease, Inc., and Skanska Construction, Inc., among others.

65.     Beginning in 1995, Nastasi & Associates entered into contractual agreements with Bloomberg to perform carpentry services at various Bloomberg-leased buildings throughout New York City.  Nastasi & Associates provided services under the agreement that included the design of proprietary systems to alleviate any issues that arose concerning the interiors at the Bloomberg properties.

66.     Nastasi & Associates performed this work at six New York City Bloomberg locations: 1) 499 Park Avenue; 2) 110 East 59th Street; 3) 560 Washington Street; 4) 731 Lexington Avenue; 5) 340 West Street; and 6) 25 East 79th Street (Bloomberg Philanthropies).  Bloomberg required Nastasi & Associates to be available for maintenance work 24 hours per day - 7 days per week – 365 days per year.

67.     During the relevant time period, all Nastasi & Associates employees that performed work at Bloomberg properties were union members of the New York City District Council of Carpenters, Lathers Local 46, and Tapers Local 1974 (the "Carpenters Union").

68.     For approximately twenty years, starting in 1995, Bloomberg consistently awarded Nastasi & Associates contracts that it bid on at Bloomberg's various properties, either through Structure Tone, Turner, other general contractors, or, in some cases, Bloomberg directly.  In all of those cases, Nastasi & Associates performed its work professionally and competently for Bloomberg.

69.     In 2005, Bloomberg awarded Nastasi & Associates a contract through a Request for Proposal ("RFP") for maintenance work to be performed at its headquarters located at 731 Lexington Avenue.  The work included carpentry work, drywall work, acoustical ceilings, specialty metal and fabric ceilings, wood and hollow metal frames, doors and hardware, woodwork, plastic laminate work, and other similar products and services as requested by

Bloomberg.  The Statement of Work, as memorialized in a Services Agreement ("2005 Services Agreement"), required Nastasi & Associates to provide a foreperson, an assistant foreperson, three carpenters, and an apprentice full-time at the location.  The agreement's initial term was two years, and it automatically renewed on a month-to-month basis unless terminated by either party.

70.     In September 2010, Bloomberg again issued an RFP for the same or similar work at the 731 Lexington headquarters, and again awarded the contract to Nastasi & Associates. Bloomberg and Nastasi & Associates memorialized the terms of the agreement in a Master Services Agreement ("2010 Master Services Agreement"), attached as Exhibit A.   The agreement's initial term was two years, and it automatically renewed for an additional year at the end of the term, unless terminated by either party.  The 2010 Master Services Agreement could be terminated only upon thirty days written notice and superseded all previous agreements.  The Statement of Work, which incorporates by reference the 2010 Master Services Agreement, is attached as Exhibit B.

71.     The Bloomberg employees directly responsible for any work in connection with the 2010 Master Services Agreement, and the bids placed at Bloomberg properties, were Javier Paulino, Marilyn Francisco, and Anthony Guzzone.  Lauren Smith oversaw this team, and later Dale Summerville maintained certain oversight responsibilities.

72.      From 1995 through 2015, Nastasi & Associates, under these agreements and others, performed extensive, high quality work for Bloomberg directly as well as through Structure Tone and Turner.  During this time period, Nastasi & Associates generated $95,167,000 from the work it did for Bloomberg.

73.     These revenues generated from the work that Nastasi & Associates performed for Bloomberg were critical to Nastasi & Associates' viability and made up a significant portion of its annual revenue.

### C. Bloomberg and Turner Executives Implement a Bid Rigging Scheme to Award Bids to Hand Picked Subcontractors that Pay Them Illicit Bribes

74.     In or about 2011, Bloomberg and Turner executives began orchestrating a scheme, in concert with several subcontractors, including the Subcontractor Defendants, to manipulate the Bloomberg bidding system in order to exclude Nastasi & Associates and other honest subcontractors from any new work.  The scheme would result in not only Nastasi & Associates' loss of future business with Bloomberg, but the fraudulent termination of the 2010 Master Services Agreement, and ultimately the destruction of the Company.

75.     After twenty years of consistently performing quality services to Bloomberg and consistently winning contracts it bid for at its locations, a new opportunity arose for Nastasi & Associates when Bloomberg announced in 2010 that it would be acquiring and building more space at 120 Park Avenue to accommodate its rapid growth.  Bloomberg hired Turner to be the general contractor on the project.

76.     Bloomberg issued an RFP for the work to be performed at the 120 Park Project as it previously did for the work at 731 Lexington Avenue.  The work at the 120 Park Project was not part of the 2010 Master Services Agreement.

77.     For Bloomberg, the bidding process was controlled and/or overseen by several high-level Bloomberg executives – Global Head of Facilities and Real Estate Lauren Smith, Head of Global Construction Anthony Guzzone, Construction Managers Michael Campana and Javier Paulino, COO of Global Real Estate and Facilities Dale Summerville, and Facilities Director Marilyn Francisco.

78.     Nastasi & Associates submitted bids to Turner, and the contracts were only awarded upon consultation with Bloomberg.  The Turner executives overseeing the bidding process and the selection of subcontractors were Account Executive Ronald Olson and Project Superintendent Vito Nigro, as well as the Turner Estimating and Purchasing Department, which included head of Turner Interiors and Vice President John Thommen, head of Turner Purchasing Vincent Massucci, and Vice President Norbert Rahm.

79.     As had been the case throughout its thus far sterling relationship with Bloomberg, Nastasi & Associates believed the bidding process would be fair and competitive with an emphasis on competitive pricing.  The Enterprise, however, misled Nastasi & Associates.  The Enterprise, spearheaded by executives from Turner (Olson and Nigro) Bloomberg (Guzzone, Paulino, Campana, Summerville, and Smith), Donaldson Acoustics (Robert and Douglas Donaldson), and Eurotech (Fay Devlin), as well as others to be named, colluded to fix the bidding process for these jobs through a system of commercial bribery and bid rigging.

80.     As described by the New York Times, Anthony Guzzone was the "capstone on this pyramid of corruption," in a "brazen" scheme that included "[e]xecutives at both Bloomberg and Turner Construction routinely steered contracts to favored electrical contractors, vendors and others in exchange for cash, favors, or work on their homes, the indictments said. The executives and contractors in turn inflated the cost of their work for Bloomberg by millions of dollars."

81.     While Bloomberg was certainly damaged by the resulting bid inflation, the greatest impact was felt by the honest subcontractors who devoted resources to bidding for and resourcing Bloomberg projects based on the false belief that Bloomberg's bidding process was competitive. In that respect, Bloomberg's failure to detect the bid rigging scheme and its orchestration by the highest-level Bloomberg executives in charge of Bloomberg real estate and facilities caused

substantial harm to those subcontractors who believed they were bidding in a competitive process free of market manipulation.

82.     Nastasi & Associates was one of those subcontractors that was not only substantially harmed, but intentionally destroyed by the Enterprise driving the scheme, which included the individual Bloomberg and Turner executives, Turner, Donaldson Acoustics, and Eurotech (including the individuals that managed these subcontractors).

83.     The Enterprise's scheme began with bidding for sections of the 120 Park Project. Nastasi & Associates reasonably anticipated winning the bids based on its long, successful history with both Bloomberg and Turner and its competitive pricing.

84.     Bloomberg requested bids for the different sections of the 120 Park Project as the construction progressed, breaking them up into several phases based on the timing of the particular job.  Starting in or around the end of 2010, Nastasi & Associates began bidding on these phases as Bloomberg issued the RFPs.

85.     There was approximately $40,000,000 worth of carpentry and other related construction work on the 120 Park Project, phased out over five years, pursuant to numerous RFPs.

86.     On information and belief, Nastasi & Associates was the lowest bid on the first two jobs yet lost the jobs to Donaldson Acoustics.  In both cases, Nastasi & Associates had anticipated getting the work based on its decades-long relationship with Bloomberg and the fact that it was the lowest bidder.  Despite all the foregoing, the Enterprise purposely and intentionally denied Nastasi & Associates all of its submitted bids for work at the 120 Park Project.

87.     In or around July 2011, for the third time, Nastasi & Associates bid on a project at the 120 Park Project, which included another phase of the overall work.

88.     Nastasi & Associates submitted a bid of approximately $800,000 for the third phase of the 120 Park Project.  It was informed and is aware that it was the lowest bid for the work to be performed.  Nonetheless, after the bidding closed, it learned that Bloomberg and Turner awarded Donaldson Acoustics that contract as well.

89.     Confused by this result, Anthony Nastasi, the Principal of Nastasi & Associates, reached out first to certain individuals within Turner who confirmed that the Company had been the lowest bidder, but still did not get the work.

90.     As was later discovered, the Bloomberg and Turner executives involved in the Enterprise, acting in concert, fraudulently altered Nastasi & Associates' bid after it was submitted.  Specifically, the Enterprise manually adjusted Nastasi & Associates' bid from $800,000 to $900,000.   Bloomberg and Turner manipulated the bids in several ways, including, for example as here, by increasing allowances during the Bloomberg's and Turner's leveling process, which falsely rendered Plaintiff's bid higher than that of Donaldson Acoustics.

91.     Thereafter, Nastasi & Associates confronted Anthony Guzzone about the lost bid and the information he had learned.  In an email dated July 7, 2011, Anthony Nastasi wrote: "I was told I did not get the Bloomberg job so that makes me 0-3.  I was greatly disappointed especially at the fact that I was the legitimate low bidder but somehow the #'s changed at the last minute and I lost the job by 10k?"

92.     Guzzone, who would be indicted for bid rigging in connection with the 120 Park Project deflected in response: "Anthony, I understand your disappointment but according to the leveling sheet that was presented to me, Donaldson was the low bidder and it is for much more than 10k.  Unfortunately I do not have control over the bid process and am subject to using Turners recommendation unless there is an obvious reason why I shouldn't."

93.     In truth, unbeknownst to Nastasi at the time and as has now been revealed, Guzzone, Paulino, and Campana (and potentially others) were accepting bribes from the Subcontractor Defendants, falsifying records, and inflating bids on the 120 Park Project.  Neither Guzzone nor any other Bloomberg or Turner executives provided Nastasi or the Company with any other reason for the lost bids – meaning, had Nastasi & Associates been the lowest bidder, it had every reason to believe that it would have obtained the work.

94.     Later, when Nastasi pressed his concerns about losing bids, Guzzone responded, "give me a reason to do something about this."  Nastasi did not know what Guzzone meant, but, in retrospect, Guzzone apparently was alluding to making payments to join the bid rigging scheme.

95.     On information and belief, Donaldson Acoustics was not only complicit in this scheme, but conspired with Bloomberg and Turner to cause the loss of this business for Nastasi & Associates by paying a bribe.  Plaintiff learned in 2015 that Defendants steered Donaldson several lucrative jobs that should have gone to Nastasi & Associates.  The reason provided to Anthony Nastasi, whether true or not, was that Douglas Donaldson was married to the niece of Bloomberg Director Martin Geller.

96.     The anticompetitive conduct by Donaldson Acoustics, Bloomberg, and Turner caused substantial losses to Nastasi & Associates.  Overall, the Enterprise wrongfully denied Nastasi & Associates approximately seven to eight bids on the 120 Park Project by purposely and intentionally changing what otherwise were the validly lowest bids to reflect much higher ones.  On information and belief, the Enterprise awarded all of Nastasi & Associates' wrongfully denied bids to Donaldson Acoustics, as part of their bid rigging scheme, based on bribes paid by Donaldson Acoustics' principals and/or officers, Robert Donaldson and Douglas Donaldson.

97.     In addition to Guzzone, Paulino, and Campana, Nastasi & Associates is informed and aware, in part from its relationship and work with Bloomberg as well as through its discussions with certain knowledgeable individuals, that at least Francisco, Summerville, and Smith, but likely more Bloomberg employees, were involved with the bid rigging scheme, and caused Nastasi & Associates to lose these contracts.

98.     By 2015, after losing approximately seven or eight manipulated bids, all of which it should have won based on its competitive bid proposal as submitted, Nastasi & Associates stopped bidding on Bloomberg projects altogether because of its concerns with the bidding process.

99.     Anthony Nastasi continued to raise concerns about Bloomberg's bidding process and treatment of Nastasi even after Nastasi & Associates stopped bidding for projects and lost its Bloomberg contract.

100.     For example, on March 2, 2016, Nastasi wrote Lauren Smith requesting a meeting to discuss "the illegal termination and theft of my company by your organization back on April 23, 2015, particularly by Javier Paulino, Marilyn Francisco, and Anthony Guzzone." Defendant Smith, Global Head of Facilities and Real Estate for Bloomberg, ignored his email. After the indictments, Bloomberg claimed it was as shocked as anyone to learn about the criminal conspiracy, despite being put on notice as early as (though likely much earlier than) 2016.

101.     Similarly, Nastasi sent several emails to Turner in-house counsel Jeffrey Egan, and had several conversations with Egan, as early as December 2016, in which he put Turner on notice of the corrupt business practices of Turner executives. Mr. Egan did not, to Nastasi's knowledge, ever address these concerns raised by Nastasi.

102.    Nastasi again attempted to bring light to Bloomberg's and Turner's improper conduct in March of 2017 when he met with Turner's outside compliance attorneys, who, on information and belief, still failed to address bidding concerns or implement adequate controls to prevent the ongoing market manipulation of bidding for Bloomberg projects.

103.    Yet, upon the announcement of the indictments of Bloomberg and Turner executives, like Bloomberg, Turner purportedly could not believe that the brazen scheme went undetected for so long given its strong compliance program, describing the scheme as a "systematic effort to avoid detection."  The opposite is true, however, as Turner's compliance program was woefully deficient to non-existent, and the prospect of Turner's anticompetitive, market manipulation was brought to Turner's attention by Nastasi and potentially others.

104.    The reality is Turner's market manipulation and its destruction of companies who stand in its way is consistent with Turner's long-standing culture of hardball practices.  In 2005, as just one example, when several Turner executives left Turner to start their own general contracting business, Hunter Roberts Construction Group ("Hunter Roberts"), Turner called a meeting of many of the major subcontractors in New York City, including Plaintiff, after news of the mass exodus broke.  Led by current CEO and President Pete Davoren, a team of Turner executives that included Davoren, Vincent Massucci (Vice President and Head of Purchasing), Norbert Rham (Vice President), and John Thommen (former Vice President and Head of Interiors) threatened that if any of the subcontractors worked with Hunter Roberts, they would never work with Turner again, and all of the payment on the amounts owed to them would be delayed.

105.    This is how Turner runs its business.  Everyone knows the risk of crossing Turner, and apparently Turner isn't particularly concerned about showing it.

**D. Bloomberg, Turner, and Eurotech Fraudulently Conspire to Destroy Nastasi & Associates**

106.    In response to Anthony Nastasi's complaints and failure to "give [the Enterprise] a reason to do something" to award the Company bids at the 120 Park Project, the Enterprise and Subcontractor Defendant Eurotech, acting in concert, orchestrated a scheme to usurp Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement.  Beyond that, on a much broader and destructive level, the Enterprise sought to drive Nastasi & Associates out of business altogether.

107.    Nastasi & Associates is informed and believes that the Enterprise implemented the scheme by, among other things,: (a) creating a fraudulent Stop Work Order against Nastasi & Associates; (b) improperly purporting to terminate the Company pursuant to the 2005 Services Agreement (whereas the 2010 Master Services Agreement was operative) and replacing Nastasi & Associates with Eurotech; and (c) accepting bribes from Eurotech's CEO Fay Devlin in order to procure the work.

108.    The Carpenters Union, however, never actually issued any Stop Work Order for Nastasi & Associates.  The Enterprise, through Bloomberg, fabricated the fraudulent Stop Work Order as a purported justification to usurp Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement and replace them with Eurotech.

109.    On April 22, 2015, in response to being notified of the fraudulent Stop Work Order, Nastasi & Associates informed Bloomberg that: (a) it had no knowledge of any Stop Work Order; (b) that it was ready, willing and able to perform any work Bloomberg needed; and (c) that it would take care of any alleged union issue and get back to Bloomberg the following day.  During that same conversation, Bloomberg advised Nastasi & Associates that the Company's employees

would not be allowed to perform any work at Bloomberg facilities until the fabricated "Stop Work Order" was resolved to the Carpenter Union's satisfaction.

110.    On the very same day, despite these assurances from Nastasi & Associates regarding the fabricated Stop Work Order, the Enterprise, through Bloomberg, installed Eurotech as the new carpentry contractor for all work the Company had been performing pursuant to the 2010 Master Services Agreement.  Also, in furtherance of the scheme to destroy Nastasi & Associates, the Enterprise, through Bloomberg, threatened the Company's employees, many of whom had worked at Bloomberg's facilities for close to ten years, that they would never work at a Bloomberg site again if they did not join Eurotech.

111.    On April 23, 2015, Nastasi & Associates again advised Bloomberg that there was no Stop Work Order and that all required work would be finished on time.  On the very same day, Bloomberg's Director of Worldwide Facilities, Lauren Smith, sent a letter to Nastasi & Associates purporting to terminate the Company pursuant to paragraph 2(e) of the superseded 2005 Services Agreement (the "April 23rd Smith Letter").

112.    On April 25, 2015, Nastasi & Associates responded to the April 23rd Smith Letter and emphatically told Bloomberg: (a) that Nastasi & Associates was ready, willing and able to fulfill all of its contractual obligations to Bloomberg; and (b) that Bloomberg had wrongfully purported to terminate the Company pursuant to the 2005 Services Agreement.

113.    On April 29, 2015, the Enterprise formally completed this portion of their conspiracy to usurp Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement by having Bloomberg send the Company a letter which (the "April 29th Summerville Letter") utilized the fraudulent "Stop Work Order" as a pretext for Nastasi & Associates' purported termination; Bloomberg's Real Estate Chief Operating

Officer, Dale Summerville, delivered this coup de grace in the Enterprise's scheme to destroy Nastasi & Associates.

114.    The April 29th Summerville Letter reaffirmed Bloomberg's position (first contrived in the April 23rd Smith Letter) that: (a) it purportedly terminated Nastasi & Associates pursuant to the superseded 2005 Services Agreement; and (b) that pursuant to the superseded 2005 Services Agreement, Bloomberg had the right to terminate Nastasi & Associates without giving the Company any notice whatsoever.  In fact, however, the 2010 Master Services Agreement was the contract then currently in effect between the parties.  Pursuant to the 2010 Master Services Agreement, Bloomberg could only terminate Nastasi & Associates upon thirty (30) days written notice.

115.    In addition to Bloomberg's conduct described herein, Eurotech was also an integral part of the Enterprise's scheme to destroy the Company.   Prior to Nastasi & Associates' replacement, Eurotech took all of the Company's employees that Bloomberg had threatened to fire if they did not agree to switch employers.   To do so, Eurotech paid the wages, union dues, and union benefits for all of the former Nastasi & Associates' employees, as new Eurotech employees, prior to the date that Bloomberg usurped Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement.  Specifically, Eurotech paid said union wages, dues and benefits for the dates of April 22, 2015 through April 24, 2015, prior to the termination, demonstrating prior knowledge and agreement with Bloomberg and Turner to facilitate the scheme.

116.    Nastasi & Associates is also informed and believes that as incentive to gain all of the Company's maintenance work pursuant to the 2010 Agreement, Eurotech paid the Enterprise bribes.  In a conversation that took place shortly before the April 23rd Smith Letter was sent to the

Company, Fay Devlin, CEO of Eurotech, advised Anthony Nastasi that a bribe was the cost of doing business with Bloomberg and Turner.  Specifically, Devlin told Nastasi, "you've got to take care of Javier Paulino in order to keep those jobs."

117.   After Bloomberg improperly terminated (and steered) Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement, Anthony Nastasi sought confirmation from the Carpenters' Union that all union dues were current for the time period that the Stop Work Order was issued.

118.   On January 31, 2018, the Carpenters' Union wrote Nastasi, confirming:

> "[E]mployer "Nastasi & Associates submitted remittance reports to the Funds in 2015 showing covered carpentry work performed by employees of [Nastasi & Associates] during weeks ending April 21, April 28, and May 5, 2018. Additionally, the Funds' records show that payments were subsequently received by the Funds for the benefit contributions owed by [Nastasi & Associates] for work performed by [Nastasi & Associates'] employees during the period.  So that there will be no misunderstanding, there was no stop work order, shutdown, or withdrawal of labor for the relevant time periods as specified above since the New York City District Council of Carpenters (the "Union") did not receive such a notice from the Funds."

See Exhibit C, Letter from the Carpenters' Union, dated Jan. 31, 2018.

119.   Accordingly, no Stop Work Order was ever issued.  If such a document was created, it was fabricated and falsified.  If Bloomberg and Eurotech simply lied about its existence, they did so fraudulently.

120.   Even today, Bloomberg still controls the workers at 731 Lexington Avenue.  After Bloomberg terminated Eurotech and replaced them with another contractor, the same employees (the former Nastasi & Associates workers) are still on the job for Bloomberg, demonstrating that Bloomberg has at least partial control of the manpower and is responsible for who works on their properties or locations.

### E.  The Criminal Conspiracy Destroyed Nastasi & Associates

121.    After nearly its entire labor force left the company for Eurotech, and a major portion of its business had inexplicably been lost, Nastasi & Associates began to spiral downward, and a series of related events unfolded causing it to collapse.

122.    For example, Turner refused to pay Plaintiff approximately $6.5 million that it owed Nastasi & Associates in receivables after causing it to be improperly terminated from several non-Bloomberg jobs at which Turner was the General Contractor.   Turner knew that the withholding of this amount from the Company would cause debilitating cash-flow issues.

123.    Further, several companies refused to pay receivables due and owing at the time that the false Stop Work Order was issued to Nastasi & Associates.  This, as well as the other events proximately caused by the criminal conspiracy by the Defendants resulted in insurmountable cash flow deficiencies for Nastasi & Associates and culminated in its complete inability to operate as a business.

124.    In addition, the reputational harm flowing directly from the fraudulent Stop Work Order and the lost Bloomberg contracts also caused Nastasi & Associates to lose extensive existing business.  For example, several companies under contract for its work terminated their contracts with Nastasi & Associates due to the false and contrived union issues created by Bloomberg and Turner, resulting in approximately $80,000,000 in lost contracts.  Approximately $45,000,000.00 of the $80,000,000.00 in the signed contracts Nastasi lost were Turner projects that were given to Donaldson Acoustics.

### F.  Bloomberg's and Turner's Deficient Internal Controls Fail to Identify Fraud

125.    In addition to the affirmative acts central to the Enterprise, which were committed at the highest levels of Turner, Bloomberg, Eurotech, and Donaldson in furtherance of the scheme,

these entities also had woefully deficient internal controls to prevent this type of conduct from being committed against Turner and Bloomberg subcontractors.

126.    As described by the Manhattan District Attorney's Office, the bid rigging scheme was brazen, lasted at least five years, and included the falsification of documents, the changing of bids, the inflation of construction costs, and the stealing of money, all without detection.

127.    In addition to the numerous individuals named in this Complaint, as well as those named in the indictments, there were unquestionably several others who were involved in or knew about this scheme due to its size and scope.

128.    Despite numerous red flags, Turner and Bloomberg failed to detect or refused to address the pervasive, illicit bribery scheme.  Bloomberg and Turner assumed a duty to implement a competitive, bribery and bid rigging free RFP process and to protect the subcontractors they invited to that process.

129.    As Turner and Bloomberg admit, the scheme went undetected for years.  Not only should their compliance programs have caught this scheme, based on the breadth and brazenness of the conduct by their highest-level executives, but these companies have long been on alert that their employees, including their highest-level executives, were susceptible to it.

130.    In many cases, not only did Bloomberg fail to reprimand the executives and employees that were at the center of the scheme, including Guzzone, Smith, Paulino, Summerville, and others, but it promoted them during the relevant time period.

131.    The failure by Bloomberg and Turner to detect the scheme, or to address it when they became aware of it, caused substantial damages to Plaintiff.

## CLAIMS FOR RELIEF

## COUNT I

## Violation of Section 1 of the Sherman Act
### (Against All Defendants)

132.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

133.    Defendants and unnamed co-conspirators entered into and engaged in contracts that unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

134.    The acts committed by each of the Defendants as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

135.    During the relevant time periods, Defendants and their co-conspirators entered into continuing agreements, understandings and conspiracies in restraint of trade to artificially fix the bidding process for Bloomberg projects.  Agreements to rig bids are per se violations of Section 1 of the Sherman Act and are presumptively anticompetitive.

136.    The conspiratorial acts and combinations have unreasonably restrained competition in the New York City construction subcontractor market.

137.    The anticompetitive acts were intentionally directed at these markets and had a substantial and foreseeable impact.

138.    As a result of Defendants' unlawful conduct, Plaintiff has been injured in their business or property because they lost substantial business, including specific bids, current projects, future projects, and earned receivables.

139.    Plaintiff's injuries flow directly from Defendants' anticompetitive bid rigging conspiracies, as Defendants conspired to rig the bidding process to hand pick pre-selected bidders, and to inflate the construction costs by fixing prices on Bloomberg interior construction jobs.

140.    Plaintiff's injuries are exactly the type that the antitrust laws were intended to prevent.

141.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff was damaged.

## COUNT II
### Violation of the Donnelly Act
### (Against All Defendants)

142.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

143.    Defendants and unnamed co-conspirators entered into and engaged in contracts that unreasonably restrained trade in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, et seq.

144.    The acts committed by each of the Defendants as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

145.    During the relevant time periods, Defendants and their co-conspirators entered into continuing agreements, understandings and conspiracies in restraint of trade to artificially fix the bidding process for Bloomberg projects.  Agreements to rig bids are per se violations of the Donnelly Act and are presumptively anticompetitive.

146.    The conspiratorial acts and combinations have unreasonably restrained competition in the New York City construction subcontractor market.

147.    The anticompetitive acts were intentionally directed at these markets and had a substantial and foreseeable impact.

148.     As a result of Defendants' unlawful conduct, Plaintiff has been injured in their

business or property because they lost substantial business, including specific bids, current

projects, future projects, and earned receivables.

149.     Plaintiff's injuries flow directly from Defendants' anticompetitive bid rigging

conspiracies, as Defendants conspired to rig the bidding process to hand pick pre-selected

bidders, and to inflate the construction costs by fixing prices on Bloomberg interior construction

jobs.

150.     Plaintiff's injuries are exactly the type that the antitrust laws were intended to

prevent.

151.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff

was damaged.

**<u>COUNT III</u>**
**Violation of CIVIL RICO**
**(Against Turner Construction Corp., Eurotech Construction Corp., Donaldson Acoustics, Co. Inc., Javier Paulino, Marilyn Francisco, Anthony Guzzone, Dale Summerville, Lauren Smith, Michael Campana, Ronald Olson, Vito Nigro, Fay Devlin, Robert Donaldson and Douglas Donaldson)**

152.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

153.     18 U.S.C. Section 1962(c) make it "unlawful for any person employed by or

associated with an enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

154.    The Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants are all persons within the meaning of 18 U.S.C. Section 1961 (3).

155.    In violation of the above-mentioned statute, Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants associated with an Enterprise, which was an association in fact consisting of Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants with other persons currently not known to Plaintiff.

156.    The Enterprise engaged in and conducted activities that affected interstate commerce.

157.    The Defendants, including Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants, conducted and participated in the conduct of the affairs of the Enterprise and played a role in the management and operation of the Enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud, mail fraud, bank fraud, and commercial bribery.

158.    The Enterprise existed for at least five continuous years, which was ample time for the Enterprise to pursue its illegal purposes, and which resulted in the theft of several million dollars, as well as the destruction of Company that at one time generated almost $100 million in revenue per year.

159.    This pattern of racketeering defined as at least two predicate acts of RICO liability under 18 U.S.C. Section 1961 within a ten (10) year period, included, but was not limited to wire fraud, mail fraud, bank fraud, and commercial bribery, among others, which

formed the basis for the guilty plea of Javier Paulino, and the indictments of Anthony Guzzone, Michael Campana, Ronald Olson, Vito Nigro, and many others.

160.    Wire fraud, under 18 U.S.C. Section 1343, is defined as "for the purpose of executing Defendants' scheme and artifice to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, Defendants did transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice."

161.    Mail fraud, under 18 U.S.C. Section 1341, is defined as "devis[ing] any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting do so, places in any pose office or authorized depository for mail matter, any matter or thing whatsoever to be sent or delivered by the Postal Service, or deposits or causes to be deposited ay matter or thing whatsoever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon[.]"

162.    Bank fraud, under 18 U.S.C. 1344 is defined as "knowingly execut[ing], or attempt[ing] to execute a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities . . . under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]"

163.    The foregoing predicate acts of racketeering activity described in detail in this Complaint conducted by the Bloomberg Defendants, Turner Defendants, and the Subcontractor Defendants through the Enterprise caused Plaintiff to lose substantial business opportunities and

money, substantially harmed Plaintiff's business reputation, and caused significant other consequential, incidental, and special damages.

164.    Additionally and separately, Turner, Eurotech, and Donaldson Acoustics are vicariously liable for the RICO violations of their employees and agents because they either knew about, or were recklessly indifferent to the unlawful activities, each company benefitted from the illegal conduct, and the fact that the massive bid rigging and commercial bribery scheme continued for over five years strongly suggest that numerous employees, in addition to those named herein, new about and substantial assisted them in perpetrating this "brazen" scheme.

165.    As a direct and proximate result of Defendants criminal act in furtherance of the RICO Enterprise, Plaintiff was damaged.

## COUNT IV

### RICO CONSPIRACY

**(Turner Construction Corp., Eurotech Construction Corp., Donaldson Acoustics, Co. Inc., Javier Paulino, Marilyn Francisco, Anthony Guzzone, Dale Summerville, Lauren Smith, Michael Campana Ronald Olson, Vito Nigro, Fay Devlin, Robert Donaldson and Douglas Donaldson)**

166.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

167.    18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to violate any provisions of subsection . . . (c) of this section."

168.    Through a series of activities outlined above, the Bloomberg Defendants, the Turner Defendants, Tuner, and the Subcontractor Defendants conspired to violate 18 U.S.C. Section 1962(c) as set forth above.

169.    The Bloomberg Defendants, the Turner Defendants, Turner, and the Subcontractor Defendants willfully and knowingly agreed and conspired with other Defendants

to commit the above referenced predicate acts of wire fraud, mail fraud, bank fraud, and commercial bribery, as set forth in the guilty plea of Javier Paulino, and the indictments of Anthony Guzzone, Michael Campana, Ronald Olson, Vito Nigro, and many others.

170.    The foregoing predicate acts of racketeering activity conducted by the Bloomberg Defendants, the Turner Defendants, Turner, and the Subcontractor Defendants through the Enterprise caused Plaintiff to lose substantial amounts of money and ultimately their business entirely from lost business opportunities, lost payments, and damaged reputation, in addition to significant other consequential, incidental, and special damages.

## COUNT IV
## NEGLIGENT SUPERVISION
### (Turner and Bloomberg)

171.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

172.    At all relevant time, Guzzone, Paulino, Francisco, Smith, and Summerville were employed by Bloomberg, and Olson and Nigro were employed by Turner.

173.    Bloomberg and Turner breached their duty to control and supervise these employees

174.    While working at and on behalf of Bloomberg and Turner, these employees hatched a bid rigging and illicit commercial bribery scheme that resulted in the wrongful steering of construction jobs away from Plaintiff.

175.    Bloomberg and Turner knew or should have known about this criminal conspiracy because significant red flags would have alerted them to it, including the direct manipulation of the bidding process in their own database, direct warnings from Plaintiff regarding irregularities in their bidding process, and the massive scope and general brazenness of the individual employees involved.

176.    Bloomberg and Turner, both directly or indirectly linked to other similar construction schemes, should have had protections in place to prevent their employees from orchestrating an extensive bid rigging and commercial bribery scheme, yet this scheme was carried out over a six-year period without detection.

177.    The supervision of these employees was so negligent that it was not allegedly discovered by these companies until after the District Attorney's Office caused their offices to be raided in connection with its investigation.

178.    Due to Turner and Bloomberg's negligent retention of these employees, this scheme lasted six years.  Had the scheme been discovered and terminated by a properly functioning internal controls and compliance program, Plaintiff would not have suffered such extensive damages.

179.    Guzzone, Paulino, Francisco, Smith, and Summerville at Bloomberg, and Olson and Nigro at Turner, used Bloomberg's and Turner's chattels to perpetrate their scheme.

180.    As a direct and proximate result of breaching their duty to Plaintiff, Bloomberg and Turner injured Plaintiff due to the improper diversion of the work outlined herein and the intentional destruction of his business.

## COUNT IV
## NEGLIGENT RETENTION
### (Turner and Bloomberg)

181.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

182.    Turner and Bloomberg had a duty to Plaintiff to ensure that they did not retain employees and agents that would harm Plaintiff.  In order to carry out that duty, they were required at a minimum to adequately monitor the actions of their employees and agents and to

inquire when irregularities became apparent in the bidding process for Bloomberg construction jobs.

183.    Turner and Bloomberg breached their duty to Plaintiff.

184.    At all relevant times, Guzzone, Paulino, Francisco, Smith, and Summerville were employees of Bloomberg, and Olson and Nigro were employees of Turner.

185.    Bloomberg and Turner knew or should have known about this criminal conspiracy because significant red flags would have alerted them to it, including the direct manipulation of the bidding process in their own database, direct warnings from Plaintiff regarding irregularities in their bidding process, and the massive scope and general brazenness of the individual employees involved.

186.    Due to Turner and Bloomberg's negligent retention of these employees, this scheme lasted six years.  Had the scheme been discovered and terminated by a properly functioning internal controls and compliance program, Plaintiff would not have suffered such extensive damages.

187.    As a direct and proximate result of breaching their duty to Plaintiff, Bloomberg and Turner injured Plaintiff due to the improper diversion of the work outlined herein and the intentional destruction of its business.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

      a.   Judgment in an amount trebled, to be determined at trial, plus interest and late fees;

      b.   Additional consequential, incidental, and punitive damages;

      c.   Default, pre-judgment and post-judgment interest;

      d.    Reasonable attorneys' fees;

      e.   for such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.


Dated: December 31, 2018        Respectfully submitted,

SPIRO HARRISON


By: */s/ David B. Harrison*
     Jason C. Spiro
     David B. Harrison
     Meredith A. Sharoky
     830 Morris Turnpike, 2nd Floor
     Short Hills, NJ 07078
     Tel.: (973) 232-0882
     Fax: (973) 232-0887

     *Attorneys for Plaintiff*