UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASTASI & ASSOCIATES, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BLOOMBERG, L.P., TURNER CONSTRUCTION COMPANY, EUROTECH CONSTRUCTION CORP., DONALDSON ACOUSTICS, CO. INC., JAVIER PAULINO, MARILYN FRANCISCO, ANTHONY GUZZONE, WILLIAM DALE SUMMERVILLE, LAUREN ECKHART SMITH, MICHAEL CAMPANA, RONALD OLSON, VITO NIGRO, FAY DEVLIN, DUANE ROBERT DONALDSON, DOUGLAS DONALDSON, and Does 1-50,<br><br>　　　　Defendants. | **CIVIL ACTION NO.: 18-cv-12361 JMF**<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

## FIRST AMENDED COMPLAINT

Plaintiff Nastasi & Associates, Inc. ("Nastasi & Associates" or the "Company"), by and through its undersigned attorneys, makes the following factual allegations applicable to each cause of action pled herein against Defendants Bloomberg, L.P. ("Bloomberg"), Javier Paulino, Marilyn Francisco, Anthony Guzzone, William Dale Summerville ("Dale Summerville"), Lauren Eckhart Smith, Michael Campana (referred to herein individually or collectively as the "Bloomberg Defendants"), Turner Construction Company ("Turner"), Ronald Olson, Vito Nigro (each referred herein individually or collectively, along with Turner, as the "Turner Defendants"), Eurotech Construction Corp. ("Eurotech"), Fay Devlin,  Donaldson Acoustics, Inc. ("Donaldson Acoustics"), Duane Robert Donaldson ("Robert Donaldson"), Douglas

Donaldson, Does 1-25 (each referred herein individually or collectively as the "Subcontractor Defendants") and Does 26-50.

## PRELIMINARY STATEMENT

1.     Turner has become one of the largest interior construction general contractors in the United States and has wielded this power to take an age-old bid rigging scheme in the construction business to new heights. Turner controls a substantial sector of the interior construction business throughout the Tri-State area, and beyond, by hand-picking subcontractors, including Eurotech and Donaldson, for billions of dollars in work and manipulating the pricing of that work to its benefit and to the benefit of the Subcontractor Defendants.

2.     Plaintiff brings this action to recover hundreds of millions of dollars in damages sustained as a result of this massive, multi-billion dollar bid rigging scheme, orchestrated by Turner in collusion with the other Defendants, that was designed to manipulate the market for interior construction.  Turner conspired, through high level executives with the Subcontractor Defendants and, in several cases, Bloomberg, to carry out the scheme, which was fueled by the improper award of interior construction jobs, massively inflated general contractor fees, cash and non-cash bribes, and the falsification of electronic and non-electronic paperwork to give the appearance that the Defendants were operating a legitimate bidding process.

3.     The bid rigging scheme had a direct harm on competition, inflating the prices for interior construction by preventing a competitive bidding process for the work on the multi-million-dollar construction jobs.  Among those directly harmed by this scheme, subcontractors who were not part of the conspiracy to rig the bids, such as Nastasi & Associates, which were improperly denied jobs through the competitive bidding process even when they submitted the most competitive bids.  This caused harm to the industry as a whole, including the consumers of

interior construction services, who lost the opportunity to do business with qualified, competitive subcontractors.

4.      The interior construction market in the greater New York metropolitan market is a highly profitable market.  Every year, corporations like Bloomberg pay millions of dollars to design, build and maintain office space, including through drywall, carpeting, plumbing, millwork, and electrical system work.  Interior construction is an estimated $9.4 billion-a-year industry in New York.

5.      From about 2010 through 2018, Defendants worked together to create and promote the perception of a competitive market for interior construction projects at the properties of corporate consumers of interior construction projects ("Corporate Consumers").   Corporate Consumers, through Turner, requested bids from subcontractors and Turner managed the bidding process.  The bidding process typically should function as a mechanism to keep pricing down, allowing subcontractors to compete for the work, and Turner to determine the best bid in every project based on pricing as well as certain other relevant factors such as experience.  In reality, however, Defendants conspired to pre-select the winning bids based on a bid rigging agreement between them.

6.      In one particular case, which formed the basis for an extensive criminal investigation, Bloomberg and Turner worked together to manipulate the bidding process. Bloomberg's Head of Construction, Anthony Guzzone, and other high-level Bloomberg executives, approved the winning bids from subcontractors who participated in their bid rigging scheme, and Turner modified and falsified the bids from subcontractors not involved in the scheme, such as Nastasi & Associates, to further the scheme and manufacture the perception of a competitive bidding process.

7.    At the center of this scheme, Turner coordinated with the Subcontractor Defendants to pre-determine who would win each job, advising the Subcontractor Defendants, sometimes in advance of submitting the request for proposal ("RFP").  During the leveling process, Turner would manipulate the bids by making certain fabricated adjustments in order to give the appearance of a legitimate bidding process before awarding the work to hand-picked subcontractor.  The Bloomberg Defendants were aware of this unlawful practice and conspired directly with the Turner Defendants and the Subcontractor Defendants for the payment of cash and non-cash bribes.

8.    The Subcontractor Defendants, for their part, were in communication with Turner throughout the leveling process, and were advised ahead of selection (sometimes before the RFP itself) which subcontractor would be the winning bidder.  Through a web of cooperation both with Turner and between the Subcontractor Defendants, the Subcontractor Defendants would submit bids knowing, in many cases, whether they would be the winning bidder, often submitting false bids when they were assured by Turner that they would lose.  In agreement with each other, through Tuner, the Subcontractor Defendants took turns on these multi-million-dollar projects, with pricing largely controlled by Turner, all to the detriment of the Corporate Consumers, and to the non-compliant subcontractors.  Without a true bidding process, competition was directly harmed as well.

9.    Turner benefitted by propping up and controlling the process, resulting in higher fees to Turner.  By awarding subcontractors work on certain jobs and not others, Turner was able to ensure compliance with the illegal scheme, rewarding the complicit subcontractors with more work, expecting silence on the inflated pricing and in many cases cash and non-cash bribes in return.

10.     During the scheme, Anthony Nastasi ("Nastasi"), Principal of Nastasi & Associates, discovered discrepancies with the bidding process and sought to raise his concerns to both Bloomberg executives, including Anthony Guzzone and Lauren Eckhart Smith, Global Head of Facilities and Real Estate, and Turner executives and its legal and compliance counsel. Bloomberg ignored Nastasi's concerns, and Turner first ignored them and then retaliated against Nastasi & Associates.

11.     As a result of the conspirators' market manipulation scheme and other deceptive misconduct, Nastasi & Associates, a long-standing, growing and profitable subcontractor that generated yearly over a hundred million dollars of revenue at its peak, lost its business and employees, causing the Company to swiftly collapse.

12.     Nastasi's concerns were confirmed in 2018 with reports of a criminal investigation by the Manhattan District Attorney's Office into interior construction work performed for Bloomberg and Turner.

13.     Then, on December 11, 2018, Manhattan District Attorney Cy Vance confirmed Nastasi's concerns further, announcing the criminal indictments of numerous Bloomberg and Turner executives who were deeply involved in corruptly steering work for Bloomberg projects in which Nastasi & Associates bid, believing itself to be a competitive bidder with a fair opportunity to win.  The criminal indictments reveal the rampant payment of bribes and unfettered, reckless control accorded to senior executives at Bloomberg and Turner who took advantage of the lack of oversight to orchestrate a massive bid rigging scheme that destroyed honest Bloomberg subcontractors and the marketplace for competitive bidding for interior construction projects.

14.     The breadth of the corruption and this specific scheme is laid out by the

Manhattan District Attorney's Office in their press release:

> New York's sky-high construction costs are driven not only by market demand, but
> by pay-to-play industry corruption that makes it impossible for honest companies
> to compete.  Thanks to the unique expertise of prosecutors in my Office's Rackets
> Bureau, as well as our partners in the New York State Police, this massive, years-
> long kickback scheme has come to an end. Today's indictments and guilty pleas
> demonstrate that if you are engaging in organized crime that blocks fair competition
> in Manhattan, our prosecutors will find you, turn over every stone, and shut you
> down. This is exactly the type of the case that our Rackets Bureau was created a
> hundred years ago to bring."

15.     While bribes and illicit payments are not new to the construction industry, this

scheme to manipulate the market for bidding at Bloomberg is unique and particularly brazen in

that it involved Bloomberg's Global Head of Construction and other high level construction

executives (essentially the top management in Bloomberg's global real estate group), and the top

Turner leadership, as well as every key department at Turner, one of the largest general

contractors in New York and the surrounding area.

16.     Indeed, Turner was hired by Bloomberg ostensibly to correct issues with bid

inflation and kickbacks involving Bloomberg's predecessor contractor, but, instead, conspired

with high ranking Bloomberg executives to develop a bid rigging scheme that cost

subcontractors their businesses and caused hundreds of millions of dollars in damages.

17.     The criminal investigation thus far has revealed a web of agreements between

these high-level executives of Bloomberg, Turner, and the Subcontractor Defendants, including

payments disguised in correspondence by the perpetrators as "sandwiches," resulting in millions

of dollars of bid inflation to Bloomberg.  Notably, though, the scheme caused much more

meaningful harm to the honest subcontractors, who were improperly denied rigged bids to

Bloomberg's chosen subcontractors for dry wall, carpeting, plumbing, millwork, and electrical

systems work.  These sub-contractors lost tens of millions of dollars in work they would have obtained had it not been for the bribes.

18.     Moreover, Bloomberg and Turner are such a large part of the interior construction business that this bid rigging scheme also caused the destruction of entire subcontractor businesses who relied on work from Bloomberg and/or Turner and who lost even more work due to retaliation from the conspirators.  As Turner itself has advised large groups of subcontractors, it had the power to cause such destruction, and in this case, it carried out that threat.

19.     Plaintiff Nastasi & Associates is a contracting company that specialized in carpentry work that included the installation and maintenance of interior walls, ceilings, architectural woodwork, and plexiglass on large commercial projects around the world, but most prominently in New York City.

20.     For years, starting in 1995, Nastasi & Associates performed extensive work on many Bloomberg buildings throughout New York City, including regular maintenance work that required 24-hour availability year-round for repairs on four Bloomberg properties, 731 Lexington Avenue, 340 West Street, 499 Park Avenue, and 110 East 59th Street.  By all accounts, the work was exemplary, and Nastasi & Associates was a trusted and valued contractor on the Bloomberg properties, one of the largest property lessors in New York City.

21.     Nastasi & Associates also worked closely with Turner on hundreds of jobs, including work on Bloomberg properties for which Turner was the general contractor or a consultant.  When Bloomberg decided to build out a new headquarters at 120 Park Avenue (herein "the 120 Park Project"), Nastasi & Associates was well positioned to compete for bids on all sections of the 120 Park Project.

22.     Beginning in or about 2011, and continuing throughout all relevant time periods described herein, Defendants conspired to rig bids for construction jobs.

23.     This association-in-fact criminal enterprise (the "Enterprise") consisting of Turner, the named Turner and Bloomberg executives, and the Subcontractor Defendants, sought valid bids for the 120 Park Project, and other construction jobs, as a pretextual cover for its conspiracy.   Nastasi & Associates submitted bids for work at the 120 Park Project, and other honest subcontractors submitted bids for work at both the 120 Park Project and other jobs, which they believed they had a valid chance to win, but, in reality, never had any chance of being awarded to them.  Despite being the most experienced contractor for the work, and in many cases, the lowest bidder, Nastasi & Associates repeatedly lost the jobs to the Subcontractor Defendants, as well as other subcontractors, who were the rigged winners of a bidding scheme perpetrated by the Bloomberg Defendants, the Turner Defendants, and the Subcontractor Defendants.

24.     The Enterprise conspired to cause Nastasi & Associates to lose validly bid projects, including the ones at the 120 Park Project, by falsely inflating Nastasi & Associates' bids to give the appearance that they were inferior, and, on information and belief, predetermined the winning bidders based on illicit payments or bribes.

25.     In executing the criminal enterprise, Defendants' crimes have included: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; and, commercial bribery in violation of New York Penal Law § 180.03, among many others.

26.     After Nastasi & Associates  complained about this rigged system to Bloomberg and Turner, the Enterprise intentionally destroyed the Company's business by: a) fabricating a union Stop Work Order from the New York City District Council of Carpenters; b) inserting a

hand-picked replacement, Eurotech, into Bloomberg's regular maintenance work; c) intentionally utilizing a clause from a defunct agreement as a pretext for Bloomberg to terminate Nastasi & Associates; and d) refusing to pay Nastasi & Associates millions of dollars in approved contracts and change orders to purposely cut off its cash flow and destroy its business.

27.     Upon the District Attorney's announcement of indictments against high-level Bloomberg and Turner executives, Bloomberg and Turner quickly and conspicuously claimed that the massive scheme went undetected, despite their self-proclaimed highly competent and diligent compliance programs, which were anything but competent.  The schemes perpetrated by the Enterprise reached the highest levels of these companies, permeating through many departments and levels of employees in different areas of the construction business.  The red flags for Bloomberg and Turner were clear and frequent.

28.     Even worse, Nastasi & Associates reported sufficient information about his limited knowledge of the schemes directly to both Bloomberg and Turner, including to senior executives and in-house counsel, without any response whatsoever.  Indeed, as Plaintiff began speaking out more loudly, Defendants, in retaliation, began systematically destroying Plaintiffs' business altogether.  And, throughout this time period, many of the individuals named in this lawsuit, some of whom have pled guilty or have been criminally indicted for various related offenses, were promoted through the ranks at Bloomberg and Turner.  Defendant Javier Paulino is one of the perpetrators who pled guilty to the conduct described herein as a result of the indictments issued by the grand jury following the criminal investigation.

29.     The bid rigging scheme directly harmed competition, in violation of both federal and state antitrust laws, causing significant damage to Plaintiff, not only in lost bids, but in future

business, by employing mob-like tactics to force Nastasi & Associates out of the construction business altogether.  The Enterprise's schemes and manipulations ultimately succeeded.

30.     As a result of Defendants' anticompetitive, criminal bid rigging and fraudulent schemes, Plaintiff has suffered tens of millions of dollars in lost bids and the loss of its entire business worth hundreds of millions of dollars.

## PARTIES

31.     Plaintiff Nastasi & Associates, Inc. is a New York Corporation with its principal place of business in East Norwich, NY.  It and its predecessor companies have provided construction services throughout the New York metro area and beyond for over 100 years.

32.     Defendant Bloomberg L.P. is a New York limited partnership with its principal place of business in New York, NY.  It describes itself as a "global information and technology company" which delivers "business and financial information, news and insights to customers around the world."  It has 19,000 employees in 176 locations worldwide.

33.     Defendant Turner Construction Corp. is a New York corporation with its principal place of business in New York, NY.  It is an international construction services company with 6,000 employees and completes $12 billion of construction on 1,500 projects each year.

34.     Defendant Eurotech Construction Corp. is a New York corporation with its principal place of business in New York, NY.  It states that it has "completed projects for some of the biggest brands in the world in the finance, media, entertainment and retail industries."

35.     Defendant Donaldson Acoustics Co., Inc. is a New York corporation with its principal place of business in New York, NY.  It operates throughout the Northeastern United States.

36.     Defendant Javier Paulino is an individual residing in Nutley, NJ.

37.     Defendant Marilyn Francisco is an individual residing in Hillsdale, NJ.

38.     Upon information and belief, defendant Anthony Guzzone is an individual residing in Middletown, NJ.

39.     Upon information and belief, defendant William Dale Summerville is an individual residing in New York, NY.

40.     Defendant Lauren Eckhart Smith is an individual residing in New York, NY.

41.     Upon information and belief, defendant Michael Campana is an individual residing in Brooklyn, NY.

42.     Upon information and belief, defendant Ronald Olson is an individual residing in Massapequa, NY.

43.     Upon information and belief, defendant Vito Nigro is an individual residing in Middletown, NJ.

44.     Upon information and belief, defendant Fay Devlin is an individual residing in Irvington, NY.

45.     Upon information and belief, defendant Duane Robert Donaldson is an individual residing in Hauppauge, NY.

46.     Upon information and belief, defendant Douglas Donaldson is an individual residing in Syosset, NY.

47.     Defendant Does 1-25 are the parties whose true names and capacities are currently unknown.  On information and belief, Does 1-25 are in some manner responsible for the injuries sustained by Plaintiff and/or Defendants' predecessors-in-interest, successors-in-interest, partners, agents, principals, employers, parent corporations, subsidiary corporations,

members, instrumentalities, alter egos, conduits, joint ventures, co-conspirators, aiders and abettors, or connected with, and/or legally responsible for the actions of Defendants.

## JURISDICTION AND VENUE

48.     This Court has original subject matter jurisdiction over this case because Plaintiff's Sherman Act claim arises under the laws of the United States.  15 U.S.C. § 1, et seq.  This Court also has original subject matter jurisdiction pursuant to its civil RICO claim. 18 U.S.C. § 1964(c). This Court has pendent jurisdiction over all state law claims.

49.     The Court has personal jurisdiction over Defendants, who have at least minimum contacts with the State of New York.

50.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SPECIFIC FACTUAL ALLEGATIONS

### A.     The Market for Interior Construction in the Greater New York City Region

51.     The market for interior construction services in the Greater New York City region, inclusive of New York City and the surrounding metropolitan area of New York, New Jersey and Connecticut (the "New York Region"), is highly concentrated, with a few general contractors controlling billions of dollars of construction projects annually.

52.     The interior construction market involves the design and building of the "guts" of a building's structure.  Corporate Consumers pay tens or even hundreds of millions of dollars to interior construction general contractors, such as Turner, to rebuild or renovate existing

buildings, including by performing the design and planning for interior construction projects and working with subcontractors to perform the construction services.

53.     The general contractors put interior construction services out to bid, typically through a request for proposal ("RFP") process, to a highly concentrated group of subcontractors, who perform services including drywall, carpeting, plumbing, millwork, and electrical system work for Corporate Consumers.  Each of these service segments is a distinct submarket of the market for interior construction services.

54.     Once the general contractor receives the subcontractor bids, the general contractor reviews and tests the bids through a leveling process.  The purpose of the leveling process is to allow the general contractor to organize the bids and determine the lowest bidder by ensuring that each of the bids provides and "apples to apples" comparison for the Corporate Consumer.  In some cases, the leveling process will result in discrepancies that will require additional communication between the general contractor and the subcontractors before the general contractor presents the bids to the Corporate Consumer.  Corporate Consumers are led to believe that those bids are the result of a fair and competitive bidding process, and that the winning bid is in the most competitive bid for the particular construction service.

**B.     Turner's Scheme to Control the Market for Interior Construction Services in the New York Region**

55.     Turner has become the largest interior construction general contractor in the world.  Over the past 10 years, Turner has wielded this power to dominate and control the market for interior construction services in the New York Region.  Turner has taken advantage of this control, and the high concentration of subcontractors in the New York Region, to coordinate its

subcontractor bidders through bid rigging and bid rotation schemes across Turner's Corporate Consumers for the purpose of profiting from the resulting price inflation.

56.     Turner solicits bids from a small group of interior construction contractors for distinct components of its interior construction contracts, including drywall, carpeting, plumbing, millwork, and electrical system work.  For example, there are less than ten drywall subcontractors who bid for drywall work from Corporate Consumers in the New York Region and most of that work is controlled by Turner.  Turner's drywall contracts are worth hundreds of millions of dollars annually and the subcontractors who bid on that work are susceptible to Turner's control.

57.     Turner uses its bidding processes to coordinate its subcontractors for drywall, carpeting, plumbing, millwork, and electrical system work using bid rotation and bid rigging schemes that result in pre-determined winning bidders, price inflation to Corporate Consumers, kickbacks from subcontractors to Turner, and kickbacks from Turner to conspirators at high-level positions for the Corporate Consumers.

58.     Specifically, Turner serves as a general contractor for interior construction services for Corporate Consumers that include Bloomberg, Conde Nast, and Goldman Sachs.

59.     In Turner's role as general contractor for its Corporate Consumers, Turner conducts an RFP bidding process to select subcontractors for interior construction services.  The purpose of the RFP bidding process is to conduct a fair and balanced process for selecting the most competitive subcontractor bids.  In reality, Turner engages in the unlawful practice of pre-

determining the winning bidders pursuant to a bid rigging or bid rotation scheme that involves coordinating the bids of its subcontractor bidders.

60.    Under Turner's scheme, the subcontractors -- who know that the winning bidder is predetermined -- are encouraged to bid high.  Since the subcontractors aren't competing on price, there is little to no incentive for them to submit bids with competitive prices.

61.    After receiving the subcontractor bids, Turner enters the bids into its leveling process.  The purpose of Turner's leveling process is to make a comparison of competitive bids; however, Turner uses the leveling process to coordinate the bidders and/or manipulate the bidding process to select pre-determined subcontractors for each project.  In variations of the scheme, some bidders are submitting bids that they know will lose, and/or pre-determined winning bidders receive price information that ensures that bidder will win the bid.

62.    Turner then presents the winning subcontractor bids to Corporate Consumers, but Turner inflates the bids, with the knowledge, agreement and participation of its subcontractor bidders, through the leveling process.  Typically, Turner will then offer a "discount" to its Corporate Consumers, if the Corporate Consumer pays a fixed amount, but the discounted, fixed fee is substantially above the competitive bid price.  Thus, it would appear as if Turner is exposed to subcontractor cost overruns, but because of Turner's and the subcontractor's bid inflation, the subcontractors typically charge millions of dollars below the fixed amount paid by the Corporate Consumers, and Turner receives the difference as profit.

63.    Moreover, after agreeing to an amount, or fixed amount, with Corporate Consumers, Turner demands price concessions from its winning subcontractors to bring the price below the amount of the initial winning bid, in effect providing Turner with an additional price concession as a form of kickback.  If the subcontractor refuses, the subcontractor knows that it

will not be selected in future bid rotation or bid rigging arrangements.  Even when subcontractors present the low bid, Turner has the power to manipulate subcontractor bids through its leveling process, and Turner has, in fact, done so on frequent occasions to remove disfavored bidders from the market.

64.     To further illustrate Turner's scheme, if the pre-determined, winning bidder for drywall services presents a winning bid of $80 million, Turner uses the leveling process to inflate the bid to, for example, $90 million, by adding allowances and other forms of bid manipulation practices.  Turner would then present the winning bid to the Corporate Consumer and offer to fix the bid price at $88 million, effectively reserving the $8 million difference for itself.  Turner further demands concessions from the winning contractor on the initial $80 million bid price, which the subcontractor typically submitted to Turner as a high bid in the first place.  If Turner receives an additional $3 million in concessions from the subcontractor, Turner profits from that $3 million as well, while the winning subcontractor receives the benefits of a lucrative $77 million contract and assurances of future winning bids.  Finally, Turner receives a percentage of the contract price from the Corporate Consumer, so for every dollar of price inflation Turner achieves, Turner profits by its percentage of those dollars (in this example, the scheme's inflation would at least equal the difference between $77 and $88 million).

65.     In these ways, amongst others, interior construction subcontractors are acting in concert, through Turner, to inflate prices to Corporate Consumers.  Thus, Turner has selected its hand-picked drywall subcontractors, such as Eurotech and Donaldson, for billions of dollars in work, and, when subcontractors such as Plaintiff fell out of Turner's favor and/or refused to

concede to Turner's demands, Turner would manipulate the pricing of Plaintiff's bid so that its subcontractor conspirators would win the bids.

66.     On information and belief, Turner engaged in these types of anticompetitive schemes in connection with multi-hundred million-dollar projects, ranging from the West Village Residences, NYU's Kimmel Pavilion, Delta's Terminal at JFK, the Conde Nast Building, and the Hearst Building, which Turner directed toward pre-determined subcontractor conspirators, such as Donaldson.  These projects costs hundreds of millions of dollars and cost the Corporate Consumers even more due to Turner's scheme to inflate subcontractor bids.

### C.     Bloomberg's Role in Turner's Conspiracy

67.     Bloomberg has long been on notice of the rampant corruption in the interior construction industry.  In 2014, Bloomberg's former general contractor, Structure Tone, Inc. ("Structure Tone") pleaded guilty to corruption charges in connection with allegations that it was causing the inflation of construction costs for its clients, including Bloomberg.

68.     The guilty plea, which included a $55 million restitution payment from Structure Tone, ended an investigation that lasted several years, and covered the time period of 2005-2009.

69.     Turner was a consultant on the Bloomberg project at 731 Lexington Avenue, which was a subject of the Structure Tone investigation.

70.     In or around 2010, Bloomberg replaced Structure Tone with Turner as its general contractor for all of its major construction projects in New York City.

71.     Plaintiff is informed and believes that Bloomberg's construction group, led at the time by Anthony Guzzone, Head of Global Construction, selected Turner, in part, for the purpose of projecting to others that Bloomberg was running an honest, competitive bidding process for its construction projects.   Turner was the largest general contractor in the interior construction

market in the New York Region.  The truth is that Bloomberg installed Turner without regard for the fraudulent activities that led to the Structure Tone investigation.

72.     Turner became the general contractor on both the 120 Park Project and another project at 919 Third Avenue, among other Bloomberg projects, and wielded great power in that capacity.  As with Turner's other Corporate Consumers, Turner coordinated a bid rigging and bid rotation scheme among preferred subcontractors for interior construction services.  As a result of the scheme, Turner inflated bid prices and profited from the margins between what the subcontractors charged (or collected) from Turner and the amount paid by Bloomberg.

73.     In its role as general contractor, Turner, specifically Ronald Olson and Vito Nigro, also began to conspire with the Bloomberg Defendants, including Guzzone and other Bloomberg executives, to participate in its anticompetitive scheme, including through the payment of kickbacks to Bloomberg executives/Defendants.  Further, as a kickback for approving of Turner's inflated prices across all subcontractor segments, Guzzone formed a new electrical work subcontractor named Litespeed, and Turner directed pre-determined bids to Litespeed for electrical on Bloomberg's interior construction projects, despite Litespeed's complete lack of experience in bidding for those projects (a major red flag ignored by both Bloomberg and Turner).

74.     In this way, the Turner Defendants, Bloomberg Defendants and conspiring subcontractors, including the Subcontractor Defendants, employed a bid rigging and rotation scheme that required the agreement and coordination of key executives at Bloomberg and Turner, as well as all of the Turner business departments involved in managing Bloomberg's bidding process, and conspiring subcontractors.  In addition, other key Bloomberg executives

ignored the conspiracy, enabling Defendants to exclude qualified subcontractor from competing for Bloomberg's interior construction projects.

75.     The conspiracy between Turner and Bloomberg focused on interior construction work at certain Bloomberg locations –including the 120 Park Project and at 919 Third Avenue, among potentially others.  The Turner Defendants, the Subcontract Defendants and the Bloomberg Defendants acted in concert to form the Enterprise, which passed inside information on highly prized contracts to the Subcontractor Defendants, or falsified bid submissions to help predetermined subcontractors secure bids for lucrative interior construction jobs.  In other instances, the Enterprise recorded falsified documents and/or fabricated invoices and purchase orders to inflate budgets for the purpose of manipulating the bidding process.

76.     As reported extensively by the press following the December 2018 announcement of indictments in connection with the scheme, high-level executives from Bloomberg and Turner, along with Eurotech and Donaldson, engaged in an anticompetitive, criminal conspiracy that stifled competition by discarding subcontractors that they either did not have a financial interest in or who did not pay Bloomberg and Turner executives bribes.

77.     To secure contracts with the Bloomberg and Turner executives, "subcontractors provided the former Bloomberg and Turner executives with cash bribes and incentives including vacations and home renovations," as stated in the Manhattan District Attorney's Office December 11, 2018 press release.

78.     Further, the New York District Attorney stated that the indicted individuals, including Defendants Anthony Guzzone (Bloomberg), Michael Campana (Bloomberg), Ronald Olson (Turner), Vito Nigro (Turner), Donna Fleming (Litespeed Electric, Inc.), Robert Fleming (Litespeed Electric, Inc.), Louis Squallante (Litespeed Electric, Inc.), Mehul Changhani

(Litespeed Electric, Inc.), Thomas Conte (Litespeed), Michael Carrone (Cooling Guard Mechanical, Inc.), Hugh O'Kane (Hugh O'Kane Electric, Inc.), Rafael Betancourt (Turtle & Hughes, Inc.), and Angel Ocasio (Turtle & Hughes, Inc.), engaged in a criminal "conspiracy by paying commercial bribes, engaging in bid-rigging, falsifying business records, and laundering criminal proceeds of the schemes."

79.     The District Attorney's announcement labeled the scheme as a multi-million dollar "bid-rigging and commercial bribery conspiracy" levying charges against the 14 individuals that included Conspiracy in the Fourth Degree, Grand Larceny in the First and Second Degrees, Money Laundering in the First and Second Degrees, Commercial Bribery in the First Degree, as well as others.  As of December 11, 2018, the District Attorney had obtained over a dozen guilty pleas against individuals and corporations, and $5.5 million in restitution.

80.     Specifically, with respect to each individual Defendants named herein, the grand jury issued two indictments (the "Criminal Indictments") under the following counts:

i.      Marilyn Francisco: Two Counts of **Contract in Restraint of Trade/Monopoly** in violation of General Business Law §§ 340(1) and 341; Four Counts of **Commercial Bribe Receiving in the First Degree**, in violation of Penal Law §180.08;

ii.     Anthony Guzzone: Six Counts of Contract in **Restraint of Trade/Monopoly** in violation of General Business Law §§ 340(1) and 341; Eight Counts of **Commercial Bribe Receiving in the First Degree**, in violation of Penal Law §180.08; **Conspiracy in the Fourth Degree**, in violation of Penal Law § 105.10(1); Four Counts of **Grand Larceny in the First Degree**, in violation of Penal Law § 155.42; Four Counts of **Grand Larceny in the Second Degree**, in violation of Penal Law § 155.40(1); Six Counts of **Commercial Bribing in the First Degree**, in violation of Penal Law § 180.03; Eleven Counts of **Falsifying Business Records in the First Degree**, in violation of Penal Law § 175.10; One Count of **Offering a False Instrument for Filing in the First Degree**, in violation of Penal Law § 175.35(1); Two Counts of **Money Laundering in the First Degree**, in violation of Penal Law § 470.20(1)(b)(i)(A) and (iii); Two Counts of **Money Laundering in the Second Degree**, in violation of Penal Law § 470.15(1)(b)(ii)(A) and (iii);

    iii.    Michael Campana: Six Counts of **Commercial Bribe Receiving in the First Degree**, in violation of Penal Law §180.08; **Conspiracy in the Fourth Degree**, in violation of Penal Law § 105.10(1); Three Counts of **Grand Larceny in the First Degree**, in violation of Penal Law § 155.42; Three Counts of **Grand Larceny in the Second Degree**, in violation of Penal Law § 155.40(1); Four Counts of **Contract in Restraint of Trade/Monopoly** in violation of General Business Law §§ 340(1) and 341; Two Counts of **Money Laundering in the Second Degree**, in violation of Penal Law § 470.15(1)(b)(ii)(A) and (iii);

    iv.    Vito Nigro: One Count of **Conspiracy in the Fourth Degree**, in violation of Penal Law § 105.10(1); Four Counts of **Grand Larceny in the First Degree**, in violation of Penal Law § 155.42; Five Counts of **Grand Larceny in the Second Degree**, in violation of Penal Law § 155.40(1); Eight Counts of **Commercial Bribe Receiving in the First Degree**, in violation of Penal Law §180.08; Two Counts of **Money Laundering in the First Degree**, in violation of Penal Law § 470.20(1)(b)(i)(A) and (iii); Two Counts of **Money Laundering in the Second Degree**, in violation of Penal Law § 470.15(1)(b)(ii)(A) and (iii); Four Counts of **Contract in Restraint of Trade/Monopoly** in violation of General Business Law §§ 340(1) and 341; Eight Counts of **Falsifying Business Records in the First Degree**, in violation of Penal Law § 175.10;

    v.    Ronald Olson: One Count of **Conspiracy in the Fourth Degree**, in violation of Penal Law § 105.10(1); Four Counts of **Grand Larceny in the First Degree**, in violation of Penal Law § 155.42; Five Counts of **Grand Larceny in the Second Degree**, in violation of Penal Law § 155.40(1); Eight Counts of **Commercial Bribe Receiving in the First Degree**, in violation of Penal Law §180.08; Two Counts of **Money Laundering in the First Degree**, in violation of Penal Law § 470.20(1)(b)(i)(A) and (iii); Two Counts of **Money Laundering in the Second Degree**, in violation of Penal Law § 470.15(1)(b)(ii)(A) and (iii); Four Counts of **Contract in Restraint of Trade/Monopoly** in violation of General Business Law §§ 340(1) and 341; Eight Counts of **Falsifying Business Records in the First Degree**, in violation of Penal Law § 175.10.

81.    These criminal complaints are only the tip of the bid rigging iceberg. District Attorney Vance described how Defendants' scheme made it impossible for *honest companies* to compete in the marketplace for interior construction projects.

82.    Nastasi & Associates is one of those victims, and the anticompetitive, criminal conspiracy was the proximate cause of its loss of bids directly connected to the 120 Park Project,

the loss of future work in connection with that and other projects, and the loss of its business entirely.

83.     Nastasi & Associates, at one time a $100 million per year business operating throughout New York, New Jersey and Connecticut and beyond, has been destroyed, an intended direct and proximate result of the conspiracy employed by the Bloomberg Defendants, the Turner Defendants, and the Subcontractor Defendants.

84.     Defendants' conspiracy has also reduced competition in the market for interior construction services, including specifically drywall services.  If Defendants' conduct continues unabated and they are permitted to eliminate businesses, one-by-one, it will further distort the market for interior construction services throughout the New York Region.

85.     Notably, the indictments are consistent with Plaintiff's experience with the way Bloomberg awarded construction jobs, and how Turner controlled the interior construction industry in the New York Region; however, the responsibility is shared by more than just the indicted individuals.  Given the Structure Tone history, Bloomberg and Turner were on notice of the significant potential for market manipulation schemes of the kind that played out for the last eight years, and their failure to establish controls at either company to detect the bid rigging that victimized Nastasi & Associates and others, in increased prices across the industry, is nothing short of reckless, or worse, intentional.

86.     The inference of intentional or reckless misconduct, beyond merely the named high-level executive Defendants, is particularly strong here because Nastasi & Associates made efforts to raise competitive bidding issues to Bloomberg and Turner directly, at various times during the scheme, without any type of adequate or diligent response.

**D.      Nastasi & Associates, a Leader in the Interior Construction Industry, Begins Long, Successful Partnership with Bloomberg**

87.     As described in a recent New York Times article, "[i]nterior construction is a little-known but highly profitable world in which corporations pay millions of dollars to design and build the guts – dry wall, carpeting, plumbing, millwork, electrical systems – of their offices."  It is a $9.4 billion industry in New York City.

88.     Nastasi & Associates has been in business for over a century, providing contracting services for interior construction projects on major developments around the world.

89.     At one time, Nastasi & Associates was one of the largest, if not the largest, union carpentry firms in the United States, consistently generating tens of millions of dollars per year on work it performed for various major contractors including Structure Tone, Turner, Bovis Lend Lease, and Skanska Construction, among others.  Over time the general contracts who control the interior construction industry have become more concentrated and dominant.  Turner is the largest and most powerful general contractor.

90.     Beginning in 1995, Nastasi & Associates entered into contractual agreements with Bloomberg to perform carpentry services at various Bloomberg-leased buildings throughout New York City.  Nastasi & Associates provided services under an agreement that included the design of proprietary systems to alleviate any issues that arose concerning the interiors at the Bloomberg properties.

91.     Nastasi & Associates performed this work at six New York City Bloomberg locations: 1) 499 Park Avenue; 2) 110 East 59th Street; 3) 560 Washington Street; 4) 731 Lexington Avenue; 5) 340 West Street; and 6) 25 East 79th Street (Bloomberg Philanthropies).  Bloomberg required Nastasi & Associates to be available for maintenance work 24 hours per day - 7 days per week – 365 days per year.

92.     During the relevant time period, all Nastasi & Associates employees that performed work at Bloomberg properties were union members of the New York City District Council of Carpenters, Lathers Local 46, and Tapers Local 1974 (the "Carpenters Union").

93.     For approximately twenty years, starting in 1995, Bloomberg consistently awarded Nastasi & Associates contracts that it bid on at Bloomberg's various properties, either through Structure Tone, Turner, other general contractors, or, in some cases, Bloomberg directly. In all of those cases, Nastasi & Associates performed professional, high quality work for Bloomberg.  During this time period, Nastasi received bids from Bloomberg, whether through Structure Tone, Turner or directly, because of its long history and strong working relationship with Bloomberg.

94.     In 2005, Bloomberg awarded Nastasi & Associates a contract through an RFP for maintenance work to be performed at its headquarters located at 731 Lexington Avenue.  The work included carpentry work, drywall work, acoustical ceilings, specialty metal and fabric ceilings, wood and hollow metal frames, doors and hardware, woodwork, plastic laminate work, and other similar products and services as requested by Bloomberg.  The Statement of Work, as memorialized in a Services Agreement ("2005 Services Agreement"), required Nastasi & Associates to provide a foreperson, an assistant foreperson, three carpenters, and an apprentice full-time at the location.  The agreement's initial term was two years, and it automatically renewed on a month-to-month basis unless terminated by either party.

95.     In September 2010, Bloomberg again issued an RFP for the same or similar work at the 731 Lexington headquarters, and again awarded the contract to Nastasi & Associates. Bloomberg and Nastasi & Associates memorialized the terms of the agreement in a Master Services Agreement ("2010 Master Services Agreement"), attached as Exhibit A.  The

agreement's initial term was two years, and it automatically renewed for an additional year at the end of the term, unless terminated by either party.  The 2010 Master Services Agreement could be terminated only upon thirty days written notice and superseded all previous agreements.  The Statement of Work, which incorporates by reference the 2010 Master Services Agreement, is attached as Exhibit B.

96.     The Bloomberg employees directly responsible for any work in connection with the 2010 Master Services Agreement, and the bids placed at Bloomberg properties, were Javier Paulino, Marilyn Francisco, and Anthony Guzzone.  Lauren Smith oversaw this team, and later Dale Summerville maintained certain oversight responsibilities for this work.

97.     From 1995 through 2015, Nastasi & Associates generated $95,167,000 from the work it did for Bloomberg.  These revenues generated from the work that Nastasi & Associates performed for Bloomberg were critical to Nastasi & Associates' viability and made up a significant portion of its annual revenue.

**E.     Bloomberg and Turner Executives Implement a Bid Rigging Scheme to Award Bids to Hand Picked Subcontractors that Pay Them Illicit Bribes**

98.     Beginning in or about 2011, Bloomberg and Turner executives orchestrated a scheme, in concert with several subcontractors, including the Subcontractor Defendants, to manipulate the Bloomberg bidding system in order to exclude Nastasi & Associates and other honest subcontractors from any new work.  The scheme would result in not only Nastasi & Associates' loss of future business with Bloomberg, but the fraudulent termination of the 2010 Master Services Agreement, and ultimately the destruction of the Company.

99.     After twenty years of consistently performing quality services to Bloomberg and consistently winning contracts it bid for at its locations, a new opportunity arose for Nastasi & Associates when Bloomberg announced in 2010 that it would be acquiring and building more

space at 120 Park Avenue to accommodate its rapid growth.  Bloomberg hired Turner to be the general contractor on the project.

100.     Bloomberg issued an RFP for the work to be performed at the 120 Park Project as it previously did for the work at 731 Lexington Avenue.  The work at the 120 Park Project was not part of the 2010 Master Services Agreement.

101.     For Bloomberg, the bidding process was controlled and/or overseen by several high-level Bloomberg executives – Global Head of Facilities and Real Estate Lauren Smith, Head of Global Construction Anthony Guzzone, Construction Manager Michael Campana, Head of Purchasing Javier Paulino, COO of Global Real Estate and Facilities Dale Summerville, and Facilities Director Marilyn Francisco.  Javier Paulino provided the RFPs to Nastasi & Associates by U.S. mail and by electronic mail.

102.     In response to the RFPs, Nastasi & Associates submitted bids to Turner, and the contracts were only awarded upon consultation with Bloomberg.  The Turner executives overseeing the bidding process and the selection of subcontractors were Account Executive Ronald Olson and Project Superintendent Vito Nigro, as well as the Turner Estimating and Purchasing Department, which included head of Turner Interiors and Vice President John Thommen, head of Turner Purchasing Vincent Massucci, and Vice President Norbert Rahm.

103.     As had been the case throughout its thus far sterling relationship with Bloomberg, Nastasi & Associates believed the bidding process would be fair and competitive with an emphasis on competitive pricing.  The Enterprise, however, misled Nastasi & Associates.  The Enterprise, spearheaded by executives from Turner (Olson and Nigro) Bloomberg (Guzzone, Paulino, Campana, Summerville, and Smith), Donaldson Acoustics (Robert and Douglas

26

Donaldson), and Eurotech (Fay Devlin), as well as others to be named, colluded to fix the bidding process for these jobs through a system of commercial bribery and bid rigging.

104.    As described by the New York Times, Anthony Guzzone was the "capstone on this pyramid of corruption," in a "brazen" scheme that included "[e]xecutives at both Bloomberg and Turner Construction routinely steered contracts to favored electrical contractors, vendors and others in exchange for cash, favors, or work on their homes, the indictments said. The executives and contractors in turn inflated the cost of their work for Bloomberg by millions of dollars."

105.    While Bloomberg was certainly damaged by the resulting bid inflation, the greatest impact was felt by the honest subcontractors who devoted resources to bidding for and resourcing Bloomberg projects based on the false belief that Bloomberg's bidding process was competitive and the Corporate Consumers who lost the opportunity for competitive bids from Nastasi & Associates and others who were driven out of business.  In that respect, Bloomberg's failure to detect the bid rigging scheme and its orchestration by the highest-level Bloomberg executives in charge of Bloomberg real estate and facilities, one of the largest consumers of those service in the New York Region, caused substantial harm to the interior construction industry and those subcontractors who believed they were bidding in a competitive process free of market manipulation.

106.    Nastasi & Associates was one of those subcontractors that was not only substantially harmed, but intentionally destroyed by the Enterprise driving the scheme, which included the individual Bloomberg and Turner executives, Turner, Donaldson Acoustics, and Eurotech (including the individuals that managed these subcontractors).

107.     The Enterprise's scheme began with bidding for sections of the 120 Park Project. Nastasi & Associates reasonably anticipated winning the bids based on its long, successful history with both Bloomberg and Turner and its competitive pricing.

108.     Bloomberg, through Javier Paulino and Anthony Guzzone, requested bids for the different sections of the 120 Park Project as the construction progressed, breaking them up into several phases based on the timing of the particular job.  Starting in or around the end of 2010, Nastasi & Associates began bidding on these phases as Bloomberg issued the RFPs.

109.     There was approximately $40,000,000 worth of carpentry and other related construction work on the 120 Park Project, phased out over five years, pursuant to numerous RFPs issued by the Turner Defendants on behalf of the Bloomberg Defendants both by U.S. mail and by electronic mail.

110.     According to the Criminal Indictments, in February 2013, at or around the time Bloomberg, through Paulino and Guzzone, issued the RFPs through emails and U.S. mail, Guzzone met with Ronald Olson and Vito Nigro to discuss a larceny and kickback scheme involving the submission of fictitious bids and inflated invoices in connection with work at the 120 Park Project.  Then, in June 2013, Guzzone, Olson, and Nigro met with Campana to invite him to participate in the larceny/kickback.  Campana agreed to be part of the scheme.

111.     Nastasi & Associates was the lowest bidder on the first two jobs yet lost the jobs to Donaldson Acoustics.  In both cases, Nastasi & Associates had anticipated getting the work based on its decades-long relationship with Bloomberg and the fact that it was the lowest bidder. Despite all the foregoing, the Enterprise purposely and intentionally denied Nastasi & Associates all of its submitted bids for work at the 120 Park Project.

112.    In or around July 2011, for the third time, Nastasi & Associates bid on a project at the 120 Park Project, which included another phase of the overall work.

113.    Nastasi & Associates submitted a bid of approximately $800,000 for the third phase of the 120 Park Project.  It was informed and is aware that it was the lowest bid for the work to be performed.  Nonetheless, after the bidding closed, it learned that Bloomberg and Turner awarded Donaldson Acoustics that contract as well.

114.    Confused by this result, Anthony Nastasi, called first to certain individuals within Turner who confirmed that the Nastasi & Associates had been the lowest bidder, but still did not get the work.

115.    As was later discovered, the Bloomberg and Turner executives involved in the Enterprise, acting in concert, fraudulently altered Nastasi & Associates' bid after it was submitted.  Specifically, the Enterprise manually adjusted Nastasi & Associates' bid from $800,000 to $900,000.   Bloomberg and Turner manipulated the bids in several ways, including, for example, by increasing allowances during the leveling process, which falsely rendered Plaintiff's bid higher than that of Donaldson Acoustics.

116.    Thereafter, Nastasi & Associates confronted Anthony Guzzone about the lost bid and the information he had learned.  In an email dated July 7, 2011, Anthony Nastasi wrote: "I was told I did not get the Bloomberg job so that makes me 0-3.  I was greatly disappointed especially at the fact that I was the legitimate low bidder but somehow the #'s changed at the last minute and I lost the job by 10k?"

117.    Guzzone, who would be indicted for bid rigging in connection with the 120 Park Project deflected in response: "Anthony, I understand your disappointment but according to the leveling sheet that was presented to me, Donaldson was the low bidder and it is for much more

than 10k.  Unfortunately, I do not have control over the bid process and am subject to using Turners recommendation unless there is an obvious reason why I shouldn't."  Guzzone, working for Bloomberg at the time, fraudulently concealed the true nature of the bid rigging scheme that he, in concert with the other Bloomberg Defendants, Turner, and the Subcontractor Defendants had implemented.

118.    In truth, unbeknownst to Nastasi at the time and as has now been revealed, Guzzone, Paulino, Nigro, Olson, Francisco, and Campana (and potentially others) were accepting bribes from the Subcontractor Defendants, falsifying records, and inflating bids on the 120 Park Project.  The false RFPs issued by Bloomberg, through Paulino and Guzzone, were part of a scheme to create the impression of a true and competitive bidding process.

119.    Thus, according the Criminal Indictments, on or about April 19, 2017, for example, Guzzone received a custom fabricated bar at his New Jersey residence.

120.    Also, according the Criminal Indictments, on or about October 12, 2017, Michael Campana possessed $239,800 in cash at his residence in Westchester County, which prosecutors have concluded was paid in connection with the illegal bribery scheme.

121.    Vito Nigro repeatedly corresponded with subcontractors and co-conspirator Michael Campana by text message and email seeking bribes described as "sandwiches" including on December 22, 2015, April 19, 2016, June 6, 2017, and August 24, 2017.

122.    Neither Guzzone nor any other Bloomberg or Turner executives provided Nastasi or Nastasi & Associates with any other reason for the lost bids – meaning, had Nastasi & Associates been the lowest bidder, it had every reason to believe that it would have obtained the work.

123.    Guzzone and the other Bloomberg and Turner executives concealed from Nastasi that the Enterprise had colluded to fix the bidding process.  Nastasi could not have reasonably discovered the scheme to rig the bidding on the 120 Park Project despite Nastasi's due diligence the reasons for his lost bids.

124.    When Nastasi pressed his concerns about losing bids, Guzzone responded, "give me a reason to do something about this."  Nastasi did not know what Guzzone meant, but, in retrospect, Guzzone apparently was alluding to making payments to join the bid rigging scheme.

125.    Upon information and belief, the Subcontractor Defendants conspired with each other and with Turner to only bid on certain jobs knowing in advance that Turner would select them for certain jobs and not for others.

126.    Turner would secretly inform each Subcontractor Defendant which job Turner was going to award to it, whether it was the dry wall work, the concrete work, the electrical work, or another type of job on the 120 Park Project.

127.    Turner would still require the Subcontractor Defendants to submit bids for work the Subcontractor Defendants knew they would not receive.   The Subcontractor Defendants cooperated with each other, through Turner, agreeing to withhold legitimate bids for certain projects, while bidding legitimately for others that Turner informed them that they would get. Non-participating subcontractors, like Nastasi & Associates, were not provided this information, and were subsequently rejected for reasons beyond whether they submitted the most competitive bids.

128.    On information and belief, Donaldson Acoustics was not only complicit in this scheme, but conspired with Bloomberg and Turner to cause the loss of this business for Nastasi & Associates by paying a bribe.  Further, upon information and belief, Turner instructed

Eurotech to submit a losing big for the drywall job at 120 Park. Eurotech agreed because Turner steered the concrete work at that site to it.

129.   Each of these parties knowingly colluded to cause Nastasi & Associates to lose these jobs by paying bribes for the work and agreeing to submit dummy bids for assurances of future work. Each of the Defendants was aware that Nastasi & Associates submitted legitimate bids for the projects and knew that it would lose the bids because of the fraudulent bid rigging scheme they participated in together.

130.   Plaintiff learned in 2015 that Defendants steered Donaldson several lucrative jobs that should have gone to Nastasi & Associates. The reason falsely provided to Anthony Nastasi, as part of Defendants' fraudulent concealment of the scheme from Nastasi was that Douglas Donaldson was married to the niece of Bloomberg Director Martin Geller.

131.   The anticompetitive conduct by Eurotech, Donaldson Acoustics, Bloomberg, and Turner caused substantial losses to Nastasi & Associates. Overall, the Enterprise wrongfully denied Nastasi & Associates approximately seven to eight bids on the 120 Park Project by purposely and intentionally changing what otherwise were the validly lowest bids to reflect much higher ones. On information and belief, the Enterprise awarded all of Nastasi & Associates' wrongfully denied bids to Donaldson Acoustics, as part of their bid rigging scheme, based on bribes paid by Donaldson Acoustics' principals and/or officers, Robert Donaldson and Douglas Donaldson.

132.   In addition to Guzzone, Paulino, and Campana, Nastasi & Associates is informed and aware, in part from its relationship and work with Bloomberg as well as through its discussions with certain knowledgeable individuals, that at least Francisco, Summerville, and

Smith, but likely more Bloomberg employees, were involved with the bid rigging scheme, and caused Nastasi & Associates to lose these contracts.

133.    By 2015, after losing approximately seven or eight manipulated bids, all of which it should have won based on its competitive bid proposal as submitted, Nastasi & Associates stopped bidding on Bloomberg projects altogether.

134.    Anthony Nastasi continued to raise concerns about Bloomberg's bidding process and treatment of Nastasi even after Nastasi & Associates stopped bidding for projects and lost its Bloomberg contract.

135.    For example, on March 2, 2016, Nastasi wrote Lauren Smith requesting a meeting to discuss "the illegal termination and theft of my company by your organization back on April 23, 2015, particularly by Javier Paulino, Marilyn Francisco, and Anthony Guzzone." Defendant Smith, Global Head of Facilities and Real Estate for Bloomberg, ignored his email. After the indictments, Bloomberg claimed it was as shocked as anyone to learn about the criminal conspiracy, despite being put on notice as early as (though likely much earlier than) 2016.

136.    Similarly, Nastasi sent several emails to Turner in-house counsel Jeffrey Egan, and had several conversations with Egan, as early as December 2016, in which he put Turner on notice of the corrupt business practices of Turner executives. Mr. Egan did not, to Nastasi's knowledge, ever address these concerns raised by Nastasi.

137.    Nastasi again attempted to bring light to Bloomberg's and Turner's improper conduct in March of 2017 when he met with Turner's outside compliance attorneys, who, on information and belief, still failed to address bidding concerns or implement adequate controls to prevent the ongoing market manipulation of bidding for Bloomberg projects.

138.    Yet, upon the announcement of the indictments of Bloomberg and Turner executives, like Bloomberg, Turner purportedly could not believe that the brazen scheme went undetected for so long given its strong compliance program, describing the scheme as a "systematic effort to avoid detection."  The opposite is true, however, as Turner's compliance program was woefully deficient to non-existent, and the prospect of Turner's anticompetitive, market manipulation was brought to Turner's attention by Nastasi and potentially others.

139.    The reality is Turner's market manipulation and its destruction of companies who stand in its way is consistent with Turner's long-standing culture of hardball practices.  In 2005, as just one example, when several Turner executives left Turner to start their own general contracting business, Hunter Roberts Construction Group ("Hunter Roberts"), Turner called a meeting of many of the major subcontractors in New York City, including Plaintiff, after news of the mass exodus broke.  Led by current CEO and President Pete Davoren, a team of Turner executives that included Davoren, Vincent Massucci (Vice President and Head of Purchasing), Norbert Rham (Vice President), and John Thommen (former Vice President and Head of Interiors) threatened that if any of the subcontractors worked with Hunter Roberts, they would never work with Turner again, and all of the payment on the amounts owed to them would be delayed, which would directly threaten the viability of their business.

140.    Similarly, Turner began a pattern of retaliating and excluding Nastasi & Associates after Nastasi & Associates won a bidding contract from MSG.  Turner was seeking the role of general contractor on a major interior construction project for MSG, and Nastasi went around Turner to bid for work directly from MSG.  Turner was named general contractor, but a portion of the construction services were awarded to Nastasi outside of Turner.  After Nastasi

won that bid, Turner proceeded to aggressively demand that Nastasi pay Turner concessions for winning the bid site and began taking steps to exclude Nastasi & Associates from the market.

141.    This is how Turner runs its business.  Everyone knows the risk of crossing Turner, and Turner does not hesitate to impose its enormous market power on subcontractors that depend on Turner for work.

**F.    Bloomberg, Turner, and Eurotech Fraudulently Conspire to Destroy Nastasi & Associates**

142.    In response to Anthony Nastasi's complaints and failure to "give [the Enterprise] a reason to do something" to award the Company bids at the 120 Park Project, the Enterprise and Subcontractor Defendant Eurotech, acting in concert, orchestrated a scheme to usurp Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement.  Beyond that, on a much broader and destructive level, the Enterprise sought to drive Nastasi & Associates out of business altogether.

143.    Nastasi & Associates is informed and believes that the Enterprise implemented the scheme by, among other things,: (a) creating a fraudulent Stop Work Order against Nastasi & Associates; (b) improperly purporting to terminate the Company pursuant to the 2005 Services Agreement (whereas the 2010 Master Services Agreement was operative) and replacing Nastasi & Associates with Eurotech; and (c) accepting bribes from Eurotech's CEO Fay Devlin in order to procure the work.

144.    The Carpenters Union, however, never actually issued any Stop Work Order for Nastasi & Associates.  The Enterprise, through Bloomberg, fabricated the fraudulent Stop Work Order as a purported justification to usurp Nastasi & Associates' valid contractual rights to

perform work for Bloomberg pursuant to the 2010 Master Services Agreement and replace them with Eurotech.

145.    On April 22, 2015, in response to being notified of the fraudulent Stop Work Order, Nastasi & Associates informed Marilyn Francisco of Bloomberg that: (a) it had no knowledge of any Stop Work Order; (b) that it was ready, willing and able to perform any work Bloomberg needed; and (c) that it would take care of any alleged union issue and get back to Bloomberg the following day.  During that same conversation, Francisco advised Nastasi & Associates, on behalf of Bloomberg, that the Company's employees would not be allowed to perform any work at Bloomberg facilities until the fabricated "Stop Work Order" was resolved to the Carpenter Union's satisfaction.

146.    On the very same day, despite these assurances from Nastasi & Associates regarding the fabricated Stop Work Order, the Enterprise, through Bloomberg, installed Eurotech as the new carpentry contractor for all work the Company had been performing pursuant to the 2010 Master Services Agreement.  Also, in furtherance of the scheme to destroy Nastasi & Associates, the Enterprise, through Bloomberg, threatened the Company's employees, many of whom had worked at Bloomberg's facilities for close to ten years, that they would never work at a Bloomberg site again if they did not join Eurotech.

147.    On April 23, 2015, Nastasi & Associates again advised Bloomberg that there was no Stop Work Order and that all required work would be finished on time.  On the very same day, Bloomberg's Director of Worldwide Facilities, Lauren Smith, sent a letter by U.S. mail to Nastasi & Associates purporting to terminate the Company pursuant to paragraph 2(e) of the superseded 2005 Services Agreement (the "April 23rd Smith Letter").  The letter was also sent to

Nastasi & Associates via email by Javier Paulino on April 24, 2015. The intent of the April 23rd Smith Letter was to carry out the final blow in the scheme to destroy Nastasi & Associates.

148.    On April 25, 2015, Nastasi & Associates responded to the April 23rd Smith Letter and emphatically told Bloomberg: (a) that Nastasi & Associates was ready, willing and able to fulfill all of its contractual obligations to Bloomberg; and (b) that Bloomberg had wrongfully purported to terminate the Company pursuant to the 2005 Services Agreement.

149.    On April 29, 2015, the Enterprise formally completed this portion of their conspiracy to usurp Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement by having Bloomberg send the Company a letter which (the "April 29th Summerville Letter") utilized the fraudulent "Stop Work Order" as a pretext for Nastasi & Associates' purported termination; Bloomberg's Real Estate Chief Operating Officer, Dale Summerville, delivered this final blow in the Enterprise's scheme to destroy Nastasi & Associates, sending the letter to Nastasi & Associates by U.S. mail.

150.    The April 29th Summerville Letter reaffirmed Bloomberg's position (first contrived in the April 23rd Smith Letter) that: (a) it purportedly terminated Nastasi & Associates pursuant to the superseded 2005 Services Agreement; and (b) that pursuant to the superseded 2005 Services Agreement, Bloomberg had the right to terminate Nastasi & Associates without giving the Company any notice whatsoever.  In fact, however, the 2010 Master Services Agreement was the contract then currently in effect between the parties.  Pursuant to the 2010 Master Services Agreement, Bloomberg could only terminate Nastasi & Associates upon thirty (30) days written notice.

151.    In addition to Bloomberg's conduct described herein, Eurotech was also an integral part of the Enterprise's scheme to destroy the Company.  Prior to Nastasi & Associates'

replacement, Eurotech took all of the Company's employees that Bloomberg had threatened to fire if they did not agree to switch employers.   To do so, Eurotech paid the wages, union dues, and union benefits for all of the former Nastasi & Associates' employees, as new Eurotech employees, prior to the date that Bloomberg usurped Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement. Specifically, Eurotech paid said union wages, dues and benefits for the dates of April 22, 2015 through April 24, 2015, prior to the termination, demonstrating prior knowledge and agreement with Bloomberg and Turner to facilitate the scheme.

152.    Nastasi & Associates is also informed and believes that as incentive to gain all of the Company's maintenance work pursuant to the 2010 Agreement, Eurotech paid the Enterprise bribes.  In a conversation that took place shortly before the April 23rd Smith Letter was sent to the Company, Fay Devlin, CEO of Eurotech, advised Anthony Nastasi that a bribe was the cost of doing business with Bloomberg and Turner.  Specifically, Devlin told Nastasi, "you've got to take care of Javier Paulino in order to keep those jobs," thereby first, admitting to the payment of bribes in connection with obtaining the Bloomberg work, and two, further implicating Javier Paulino specifically in the bribery scheme.

153.    After Bloomberg improperly terminated (and steered) Nastasi & Associates' valid contractual rights to perform work for Bloomberg pursuant to the 2010 Master Services Agreement, Anthony Nastasi sought confirmation from the Carpenters' Union that all union dues were current for the time period that the Stop Work Order was issued.

154.    On January 31, 2018, the Carpenters' Union wrote Nastasi, confirming:

> "[E]mployer "Nastasi & Associates submitted remittance reports to the Funds in 2015 showing covered carpentry work performed by employees of [Nastasi & Associates] during weeks ending April 21, April 28, and May 5, 2018.   Additionally, the Funds' records show that payments were

> subsequently received by the Funds for the benefit contributions owed by [Nastasi & Associates] for work performed by [Nastasi & Associates'] employees during the period.  So that there will be no misunderstanding, there was no stop work order, shutdown, or withdrawal of labor for the relevant time periods as specified above since the New York City District Council of Carpenters (the "Union") did not receive such a notice from the Funds."

See Exhibit C, Letter from the Carpenters' Union, dated Jan. 31, 2018.

155.    Accordingly, no Stop Work Order was ever issued.  If such a document was created, it was fabricated and falsified.  If Bloomberg and Eurotech simply lied about its existence, they did so fraudulently.

156.    Even today, Bloomberg still controls the workers at 731 Lexington Avenue.  After Bloomberg terminated Eurotech and replaced them with another contractor, the same employees (the former Nastasi & Associates workers) are still on the job for Bloomberg, demonstrating that Bloomberg has at least partial control of the manpower and is responsible for who works on their properties or locations.

### G.    The Criminal Conspiracy Destroyed Nastasi & Associates

157.    After nearly its entire labor force left the company for Eurotech, and a major portion of its business had inexplicably been lost, Nastasi & Associates began to spiral downward, and a series of related events unfolded causing it to collapse.

158.    For example, Turner refused to pay Plaintiff approximately $6.5 million that it owed Nastasi & Associates in receivables after causing it to be improperly terminated from several non-Bloomberg jobs at which Turner was the General Contractor.  Turner knew that the withholding of this amount from the Company would cause debilitating cash-flow issues.

159.    Further, several companies refused to pay receivables due and owing at the time that the false Stop Work Order was issued to Nastasi & Associates.  This, as well as the other

events proximately caused by the criminal conspiracy by the Defendants resulted in insurmountable cash flow deficiencies for Nastasi & Associates and culminated in its complete inability to operate as a business.  It also caused the destruction of Nastasi & Associates related entity, New England Construction Company, which also relied on Turner for work both through and independently from Nastasi & Associates.

160.    In addition, the reputational harm flowing directly from the fraudulent Stop Work Order and the lost Bloomberg contracts also caused Nastasi & Associates to lose extensive existing business.  For example, several companies under contract for its work terminated their contracts with Nastasi & Associates due to the false and contrived union issues created by Bloomberg and Turner, resulting in approximately $80,000,000 in lost contracts.  Approximately $45,000,000.00 of the $80,000,000.00 in the signed contracts Nastasi lost were Turner projects that were given to Donaldson Acoustics.

161.    Nastasi & Associates had previously been one of approximately six drywall contractors who performed work for Turner in New York, New Jersey and Connecticut. Eliminating Nastasi & Associates from the market significantly reduced the amount of competition in the market for drywall construction services.

**H.    Bloomberg's and Turner's Deficient Internal Controls Fail to Identify Fraud**

162.    In addition to the affirmative acts central to the Enterprise, which were committed at the highest levels of Turner, Bloomberg, Eurotech, and Donaldson in furtherance of the scheme, these entities also had woefully deficient internal controls to prevent this type of conduct from being committed against Turner and Bloomberg subcontractors.

163. As described by the Manhattan District Attorney's Office, the bid rigging scheme was brazen, lasted at least five years, and included the falsification of documents, the changing of bids, the inflation of construction costs, and the stealing of money, all without detection.

164. In addition to the numerous individuals named in this Complaint, as well as those named in the indictments, there were unquestionably several others who were involved in or knew about this scheme due to its size and scope.

165. Despite numerous red flags, Turner and Bloomberg failed to detect or refused to address the pervasive, illicit bribery scheme. Bloomberg and Turner assumed a duty to implement a competitive, bribery and bid rigging free RFP process and to protect the subcontractors they invited to that process.

166. As Turner and Bloomberg admit, the scheme went undetected for years. Not only should their compliance programs have caught this scheme, based on the breadth and brazenness of the conduct by their highest-level executives, but these companies have long been on alert that their employees, including their highest-level executives, were susceptible to it.

167. In many cases, not only did Bloomberg fail to reprimand the executives and employees that were at the center of the scheme, including Guzzone, Smith, and Paulino, Summerville, and others, but it promoted them during the relevant time period.

168. The failure by Bloomberg and Turner to detect the scheme, or to address it when they became aware of it, caused substantial damages to Plaintiff.

**I.      The Impact of Turner's Scheme on Pricing in the Internal Construction Subcontractor Market**

169. As detailed herein, Nastasi & Associates was one of the largest interior dry wall installation and maintenance companies in the Tri-State area.

170.    The destruction of Nastasi & Associates through the anticompetitive conduct described herein, including bid rigging and bid rotation, had a natural and direct impact on the pricing for interior dry wall services in the New York Region

171.    Specifically, the exclusion of one of the largest contractors from the purportedly competitive bidding process allowed other competitors, including the Subcontractor Defendants, to charge higher prices for the dry wall installation and maintenance.

172.    As described in Turner's own lawsuit brought in the Supreme Court of New York, County of New York under the caption" *Turner Construction Company v. Nastasi & Associates, Inc.*, Index No. 6552218/2017, Turner confirms the pricing impact by claiming $4.5 million in additional costs as a result of hiring a different subcontractor for the same work Nastasi & Associates had agreed to perform but was terminated in the middle of the project.

**J.    Fraudulent Concealment by Defendants**

173.    Defendants have affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from Plaintiffs.  As part of the conspiracy, Defendants went to great lengths to create the appearance of a competitive market for interior construction projects, by engaging in a bidding process where no such legitimate competitive bidding market existed.

174.    Plaintiff had no knowledge of Defendants' fraudulent scheme and could not have discovered Defendants' fraudulent activities or concealment of their scheme.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

175.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

176.   Defendants and their co-conspirators entered into and engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

177.   Specifically, the Turner Defendants have entered into agreements with selected subcontractors to coordinate interior construction services provided by subcontractor competitors to Corporate Consumers, the purpose and effect of which were to suppress or eliminate competition and to raise or maintain prices for interior construction services in the New York Market at artificially high levels.

178.   Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful scheme by the following acts, among others:

    a.    Agreeing to steer business to subcontractors in exchange for undisclosed fees, payments, benefits, concessions and/or other kickbacks from subcontractors;

    b.    Agreeing, through the use of collusive and fictitious bid prices and/or leveling processes, to manipulate bids for interior construction services;

    c.    Agreeing to engage in bidding and leveling processes that give the appearance of competition where none existed;

    d.    Coordinate bidding activities of subcontractor competitors for the purpose of inflating prices;

    e.    Agreeing to rotate bids among subcontractors, including the Subcontractor Defendants, denying customers and other subcontractors the benefits of free and open competition; and

f.      Agreeing to rig bids for subcontractors, including the Subcontractor Defendants, denying customers and subcontractors the benefits of free and open competition.

179.    Defendants' unlawful conspiracy constitutes a per se violation of section 1 of the Sherman Act, 15 U.S.C. §1.  Alternatively, their conduct violates the Sherman Act under a rule of reason analysis.

180.    The Turner Defendants reached agreements with subcontractors for interior construction services in all of the service segments covered by Turner's construction contracts with Corporate Consumers, including drywall, carpeting, plumbing, millwork, and electrical system work, each of those distinct construction service segments constituting a submarket of the New York Market for interior construction services.  In certain instances, subcontractors would bid for contracts that they knew they would not receive.  In other instances, subcontractors would receive competitor information that would enable them to present winning bids.  In still other instances, Turner would use its leveling process to coordinate bidders and manipulate subcontractor bids.

181.    The Turner Defendants conspired and agreed to the above-described schemes with the Donaldson and Eurotech Defendants, each of whom participated in Turner's schemes to rotate or rig bids for drywall services to Corporate Consumers.  Turner coordinated the bidding of subcontractor competitors such as Donaldson and Eurotech to foreclose competition amongst drywall subcontractors and inflate and/or maintain artificially high prices to Corporate Consumers and exclude other drywall subcontractors such as Plaintiff.

182.    The Turner Defendants conspired and agreed to the above-described scheme with high level executives of Bloomberg, and potentially other Corporate Consumers.  In exchange for undisclosed fees, payments, benefits, concessions and/or other kickbacks from Turner, the

Bloomberg Defendants agreed to acquiesce and/or participate in Turner's scheme to coordinate subcontractor bidders.  Specifically, the Turner Defendants paid kickbacks to Guzzone,  and Guzzone formed a subcontractor entity called Litespeed to bid on contracts for interior construction services in the submarket for electrical system work, and the Turner Defendants, through their coordination of bidding amongst subcontractors, rigged or rotated bids to pre-determine that Litespeed would win bidding for electrical system work at artificially inflated prices, without the qualifications and experience typically required of electrical system subcontractors for Turner's Corporate Consumers.

183.    Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of the alleged conspiracies.

184.    The acts committed by each of Turner, Donaldson, Eurotech, Bloomberg, and other entity conspirators, as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their high-level executives, officers, and representatives while actively engaged in the management of Defendants' affairs.

185.    The aforesaid contracts, combinations and conspiracies had the following effects, among others: (a) foreclosed Plaintiff and other subcontractors from the New York Market for interior construction services; (b) prices paid by Corporate Consumers for interior construction services were raised or maintained at artificially high, supra-competitive levels; and (c) Corporate Consumers and other participants and competitors in the New York Market for interior construction services were deprived of the benefits of free and open competition in the purchase of interior construction services.

186.    As a direct and proximate result of the contracts, combinations or conspiracies and harm to competition alleged in this Amended Complaint, Plaintiff was injured in its business or property in that it engaged in and lost bidding opportunities that were manipulated by the Turner Defendants, in coordination with other subcontractor bidders such as Donaldson and Eurotech, foreclosed from the New York Region for interior construction services, and lost its business.

## COUNT II
### Violation of the Donnelly Act
### (Against All Defendants)

187.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

188.    Defendants and unnamed co-conspirators entered into and engaged in contracts that unreasonably restrained trade in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, et seq.

189.    Specifically, the Turner Defendants have entered into agreements with selected subcontractors to coordinate interior construction services provided by subcontractor competitors to Corporate Consumers, the purpose and effect of which were to suppress or eliminate competition and to raise or maintain prices for interior construction services in the New York Market at artificially high levels.

190.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful scheme by the following acts, among others:

   a.    Agreeing to steer business to subcontractors in exchange for undisclosed fees, payments, benefits, concessions and/or other kickbacks from subcontractors;

   b.    Agreeing, through the use of collusive and fictitious bid prices and/or leveling processes, to manipulate bids for interior construction services;

c.      Agreeing to engage in bidding and leveling processes that give the appearance of competition where none existed;

d.      Coordinate bidding activities of subcontractor competitors for the purpose of inflating prices;

e.      Agreeing to rotate bids among subcontractors, including the Subcontractor Defendants, denying customers and other subcontractors the benefits of free and open competition; and

f.      Agreeing to rig bids for subcontractors, including the Subcontractor Defendants, denying customers and subcontractors the benefits of free and open competition

191.    The Turner Defendants reached agreements with subcontractors for interior construction services in all of the service segments covered by Turner's construction contracts with Corporate Consumers, including drywall, carpeting, plumbing, millwork, and electrical system work, each of those distinct construction service segments constituting a submarket of the New York Market for interior construction services. In certain instances, subcontractors would bid for contracts that they knew they would not receive. In other instances, subcontractors would receive competitor information that would enable them to present winning bids. In still other instances, Turner would use its leveling process to coordinate bidders and manipulate subcontractor bids.

192.    The Turner Defendants conspired and agreed to the above-described schemes with the Donaldson and Eurotech Defendants, each of whom participated in Turner's schemes to rotate or rig bids for drywall services to Corporate Consumers. Turner coordinated the bidding of subcontractor competitors such as Donaldson and Eurotech to foreclose competition amongst drywall subcontractors and inflate and/or maintain artificially high prices to Corporate Consumers and exclude other drywall subcontractors such as Plaintiff.

193.    The Turner Defendants conspired and agreed to the above-described scheme with high level executives of Bloomberg, and potentially other Corporate Consumers.  In exchange for undisclosed fees, payments, benefits, concessions and/or other kickbacks from Turner, the Bloomberg Defendants agreed to acquiesce and/or participate in Turner's scheme to coordinate subcontractor bidders.  Specifically, the Turner Defendants paid kickbacks to Javier Paulino, Bloomberg's Head of Purchasing, whereby Paulino formed a subcontractor entity called Litespeed to bid on contracts for interior construction services in the submarket for electrical system work, and the Turner Defendants, through their coordination of bidding amongst subcontractors, rigged or rotated bids to pre-determine that Litespeed would win bidding for electrical system work at artificially inflated prices, without the qualifications and experience typically required of electrical system subcontractors for Turner's Corporate Consumers.

194.    Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of the alleged conspiracies.

195.    The acts committed by each of Turner, Donaldson, Eurotech, Bloomberg, and other entity conspirators, as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their high-level executives, officers, and representatives while actively engaged in the management of Defendants' affairs.

196.    The aforesaid contracts, combinations and conspiracies had the following effects, among others: (a) foreclosed Plaintiff and other subcontractors from the New York Market for interior construction services; (b) prices paid by Corporate Consumers for interior construction services were raised or maintained at artificially high, supra-competitive levels; and (c) Corporate Consumers and other participants and competitors in the New York Market for

interior construction services were deprived of the benefits of free and open competition in the purchase of interior construction services.

197.    As a direct and proximate result of the contracts, combinations or conspiracies and harm to competition alleged in this Amended Complaint, Plaintiff was injured in its business or property in that it engaged in and lost bidding opportunities that were manipulated by the Turner Defendants, in coordination with other subcontractor bidders such as Donaldson and Eurotech, foreclosed from the New York Region for interior construction services, and lost its business.

## COUNT III
## Violation of CIVIL RICO
**(Against Turner Construction Corp., Eurotech Construction Corp., Donaldson Acoustics, Co. Inc., Javier Paulino, Marilyn Francisco, Anthony Guzzone, Dale Summerville, Lauren Smith, Michael Campana, Ronald Olson, Vito Nigro, Fay Devlin, Robert Donaldson and Douglas Donaldson)**

198.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

199.    18 U.S.C. Section 1962(c) make it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

200.    The Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants are all persons within the meaning of 18 U.S.C. Section 1961 (3).

201.    In violation of the above-mentioned statute, Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants associated with an Enterprise within the meaning of 18 U.S.C. Section 1961 (4), which was an association in fact consisting of Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants with other persons currently not known to Plaintiff.

**The Enterprise**

202.     The Enterprise engaged in and conducted activities that affected interstate commerce.

203.     The Defendants, including Bloomberg Defendants, Turner Defendants, Turner, and the Subcontractor Defendants, conducted and participated in the conduct of the affairs of the Enterprise and played a role in the management and operation of the Enterprise through a pattern of racketeering activities, which included, but was not limited to, wire fraud, mail fraud, bank fraud, and commercial bribery.

204.     Each Defendant was essential to and directed the operation and management of the Enterprise.  The members of the Enterprise shared a common purpose to carry out a massive, multi-billion dollar bid rigging scheme in which Turner conspired, through high level executives with the Subcontractor Defendants and, in several cases, Bloomberg, to carry out the scheme, which was fueled by the improper award of interior construction jobs, massively inflated general contractor fees, cash and non-cash bribes, and the falsification of electronic and non-electronic paperwork to give the appearance that the Defendants were operating a legitimate bidding process.

205.     The Enterprise was a sustained, well-developed operation organized for the purpose of carrying out a bid rigging scheme, inflating bids, falsifying records and defrauding contractors not participating in the scheme.

**The Racketeering Activity**

206.     Turner, the Turner Defendants, the Bloomberg Defendants and the Subcontractor Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity within the meaning of within the meaning of 18 U.S.C. Section 1961 (5).

207.     Specifically, Guzzone was the "capstone on this pyramid of corruption."  As Bloomberg's Head of Global Construction, Guzzone accepted gifts from the Subcontractor Defendants in exchange for steering jobs at the 120 Park Project to the Subcontractor Defendants.  Guzzone also falsified records and inflated bids on the 120 Park Project.

208.     Campana, as a construction manager for Bloomberg, accepted bribes, falsified records and inflated bids as part of the scheme to steer jobs at the 120 Park Project to certain contractors.

209.     Paulino, as a construction manager for Bloomberg, accepted bribes, falsified records and inflated bids as part of the scheme to steer jobs at the 120 Park Project to certain contractors.  Defendant Devlin advised Nastasi that a bribe was the cost of doing business with Bloomberg and Turner, advising him, "you've got to take care of Javier Paulino to keep those jobs" (referring to the 120 Park Project and the project at 731 Lexington Avenue).

210.     Lauren Smith, as Bloomberg's Global Head of Facilities and Real Estate, was aware of and participated in the scheme to steer jobs at 120 Park Place to certain contractors.  When advised by Nastasi in a March 2, 2016 email of "the theft" of Nastasi & Associates by Bloomberg, Smith ignored the email.  She also drafted and sent Nastasi, through Paulino, the April 23 Smith letter purporting to terminate Nastasi & Associates under false pretenses.

211.     Francisco, as Bloomberg's Facilities Director, was aware of and participated in the scheme to steer jobs at 120 Park Place to certain contractors, she also communicated with Nastasi prior to his termination, and made misrepresentations about Bloomberg's intentions in order to cover up the scheme.

212.     Dale Summerville, as Bloomberg's COO of Global Real Estate and Facilities, was aware of and participated in the scheme to steer jobs at 120 Park Place to certain contractors.  As

part of his participation in the scheme, Summerville, on behalf of the Enterprise, sent Nastasi and Associates the April 29th Summerville Letter terminating Nastasi & Associates without notice.

213.    Olson, as a Turner vice-president and account executive, oversaw the bidding process and selection of subcontractors for the 120 Park Project.  Olson accepted gifts from the Subcontractor Defendants in exchange for steering jobs at the 120 Park Project to the Subcontractor Defendants.  Olson also falsified records and inflated bids on the 120 Park Project.

214.    Nigro, as a Turner project superintendent, accepted gifts from the Subcontractor Defendants in exchange for steering jobs at the 120 Park Project to the Subcontractor Defendants.  Nigro also falsified records and inflated bids on the 120 Park Project.

215.    Devlin, as CEO of Eurotech, paid bribes to Guzzone, Campana, Paulino, Olson and Nigro to secure jobs on the 120 Park Project.  Devlin advised Nastasi that he had to bribe Paulino to obtain jobs on that project.

216.    Robert Donaldson and Douglas Donaldson paid bribes to Guzzone, Campana, Paulino, Olson and Nigro to secure jobs on the 120 Park Project for Donaldson Acoustics.

217.    The Enterprise existed for at least five continuous years, which was ample time for the Enterprise to pursue its illegal purposes, and which resulted in the theft of several million dollars, as well as the destruction of Nastasi & Associates, a company that at one time generated almost $100 million in revenue per year.

218.    This pattern of racketeering defined as at least two predicate acts of RICO liability under 18 U.S.C. Section 1961 within a ten (10) year period, included, but was not limited to wire fraud, mail fraud, bank fraud, and commercial bribery, among others, which formed the basis for the guilty plea of Javier Paulino, and the indictments of Anthony Guzzone, Michael Campana, Ronald Olson, Vito Nigro, and many others.

219.    Wire fraud, under 18 U.S.C. Section 1343, is defined as "for the purpose of executing Defendants' scheme and artifice to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, Defendants did transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice."

220.    As set forth herein, Defendants used wire, primarily through email, text message and telephone, to carry out the affairs of the Enterprise, which involved bribes, falsified records, and inflated bids and the steering of jobs to certain contracts at the 120 Park Project.

221.    Mail fraud, under 18 U.S.C. Section 1341, is defined as "devis[ing] any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting do so, places in any pose office or authorized depository for mail matter, any matter or thing whatsoever to be sent or delivered by the Postal Service, or deposits or causes to be deposited ay matter or thing whatsoever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon[.]"

222.    As set forth herein, Defendants used mail to carry out the affairs of the Enterprise. Defendants used U.S. mail for, among other purposes, to send RFPs to potential contractors and to inform Nastasi & Associates of its wrongful termination.

223.    Bank fraud, under 18 U.S.C. 1344 is defined as "knowingly execut[ing], or attempt[ing] to execute a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities . . . under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]"

224.     As set forth herein, Defendants used financial institutions to carry out the affairs of the Enterprise, including for, among other purposes, to deposit monies improperly obtained through bribery.

225.     Commercial bribery, under N.Y. Penal Law § 180.03 is defined as "confer[ring], or offer[ring] or agree[ing] to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars.

226.     As set forth herein, the Subcontractor Defendants conferred on the Turner Defendants and the Bloomberg Defendants extensive benefits, in the form of money, personal services and other benefits, with the intent to influence the conduct of the Turner Defendants and the Bloomberg Defendants to award bids to the Subcontractor Defendants on the 120 Park Project.

**Proximate Cause and Damages**

227.     The foregoing predicate acts of racketeering activity described in detail in this Complaint conducted by the Bloomberg Defendants, Turner Defendants, and the Subcontractor Defendants through the Enterprise caused Plaintiff to lose substantial business opportunities and money, substantially harmed Plaintiff's business reputation, and caused significant other consequential, incidental, and special damages.

228.     Additionally and separately, Turner, Eurotech, and Donaldson Acoustics are vicariously liable for the RICO violations of their employees and agents because they either knew about, or were recklessly indifferent to the unlawful activities, each company benefitted

from the illegal conduct, and the fact that the massive bid rigging and commercial bribery

scheme continued for over five years strongly suggest that numerous employees, in addition to

those named herein, new about and substantial assisted them in perpetrating this "brazen"

scheme.

229.    As a direct and proximate result of Defendants' criminal acts in furtherance of the

RICO Enterprise, Plaintiff was damaged.

## COUNT IV

### RICO CONSPIRACY

**(Turner Construction Corp., Eurotech Construction Corp., Donaldson Acoustics, Co. Inc., Javier Paulino, Marilyn Francisco, Anthony Guzzone, Dale Summerville, Lauren Smith, Michael Campana Ronald Olson, Vito Nigro, Fay Devlin, Robert Donaldson and Douglas Donaldson)**

230.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

231.    18 U.S.C. Section 1962(d) makes it "unlawful for any person to conspire to

violate any provisions of subsection . . . (c) of this section."

232.    Through a series of activities outlined above, the Bloomberg Defendants, the

Turner Defendants, Tuner, and the Subcontractor Defendants conspired to violate 18 U.S.C.

Section 1962(c) as set forth above.

233.    The Bloomberg Defendants, the Turner Defendants, Turner, and the

Subcontractor Defendants willfully and knowingly agreed and conspired with other Defendants

to commit the above referenced predicate acts of wire fraud, mail fraud, bank fraud, and

commercial bribery, as set forth in the guilty plea of Javier Paulino, and the indictments of

Anthony Guzzone, Michael Campana, Ronald Olson, Vito Nigro, and many others.

234.    The foregoing predicate acts of racketeering activity conducted by the Bloomberg

Defendants, the Turner Defendants, Turner, and the Subcontractor Defendants through the

Enterprise caused Plaintiff to lose substantial amounts of money and ultimately their business entirely from lost business opportunities, lost payments, and damaged reputation, in addition to significant other consequential, incidental, and special damages.

## COUNT V
## NEGLIGENT SUPERVISION
### (Turner and Bloomberg)

235.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

236.    At all relevant time, Guzzone, Paulino, Francisco, Smith, and Summerville were employed by Bloomberg, and Olson and Nigro were employed by Turner.

237.    Bloomberg and Turner breached their duty to control and supervise these employees

238.    While working at and on behalf of Bloomberg and Turner, these employees hatched a bid rigging and illicit commercial bribery scheme that resulted in the wrongful steering of construction jobs away from Plaintiff.

239.    Bloomberg and Turner knew or should have known about this criminal conspiracy, and were in the best position to discover it, because significant red flags would have alerted them to it, including the direct manipulation of the bidding process in their own database, direct warnings from Plaintiff regarding irregularities in their bidding process, and the massive scope and general brazenness of the individual employees involved.

240.    Bloomberg and Turner, both directly or indirectly linked to other similar construction schemes, should have had protections in place to prevent their employees from orchestrating an extensive bid rigging and commercial bribery scheme, yet this scheme was carried out over a six-year period without detection.

241.     The supervision of these employees was so negligent that it was not allegedly discovered by these companies until after the District Attorney's Office caused their offices to be raided in connection with its investigation.

242.     Due to Turner and Bloomberg's negligent retention of these employees, this scheme lasted six years.  Had the scheme been discovered and terminated by a properly functioning internal controls and compliance program, Plaintiff would not have suffered such extensive damages.

243.     Guzzone, Paulino, Francisco, Smith, and Summerville at Bloomberg, and Olson and Nigro at Turner, used Bloomberg's and Turner's chattels to perpetrate their scheme.

244.     As a direct and proximate result of breaching their duty to Plaintiff, Bloomberg and Turner injured Plaintiff due to the improper diversion of the work outlined herein and the intentional destruction of his business.

## COUNT VI
## NEGLIGENT RETENTION
### (Turner and Bloomberg)

245.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

246.     Turner and Bloomberg had a duty to Plaintiff to ensure that they did not retain employees and agents that would harm Plaintiff.  In order to carry out that duty, they were required at a minimum to adequately monitor the actions of their employees and agents and to inquire when irregularities became apparent in the bidding process for Bloomberg construction jobs.

247.     Turner and Bloomberg breached their duty to Plaintiff.

248.     At all relevant times, Guzzone, Paulino, Francisco, Smith, and Summerville were employees of Bloomberg, and Olson and Nigro were employees of Turner.

249.    Bloomberg and Turner knew or should have known about this criminal conspiracy because significant red flags would have alerted them to it, including the direct manipulation of the bidding process in their own database, direct warnings from Plaintiff regarding irregularities in their bidding process, and the massive scope and general brazenness of the individual employees involved.

250.    Due to Turner and Bloomberg's negligent retention of these employees, this scheme lasted six years.  Had the scheme been discovered and terminated by a properly functioning internal controls and compliance program, Plaintiff would not have suffered such extensive damages.

251.    As a direct and proximate result of breaching their duty to Plaintiff, Bloomberg and Turner injured Plaintiff due to the improper diversion of the work outlined herein and the intentional destruction of its business.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

    a.  Judgment in an amount trebled, to be determined at trial, plus interest and late fees;

    b.  Additional consequential, incidental, and punitive damages;

    c.  Default, pre-judgment and post-judgment interest;

    d.   Reasonable attorneys' fees;

    e.  for such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.

Dated: May 8, 2019                        Respectfully submitted,

                                        SPIRO HARRISON

                                    By:   */s/ David B. Harrison*
                                           Jason C. Spiro
                                         David B. Harrison
                                         Meredith A. Sharoky
                                         830 Morris Turnpike, 2nd Floor
                                         Short Hills, NJ 07078
                                         Tel.: (973) 232-0882
                                         Fax: (973) 232-0887

                                         *Attorneys for Plaintiff*